UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JULIE LOCKWOOD, | ) |
| and LINDA MOHR | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) Cause No: 1:15-cv-1348-JMS-MPB |
| | ) |
| DAN MCMILLAN, in his individual | ) |
| Capacity and in his official capacity as | ) |
| Clerk Treasurer; and the CITY OF | ) |
| BEECH GROVE | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Julie Lockwood and Linda Mohr, by counsel, respectfully file their Response in Opposition to Defendants' Motions for Summary Judgment.

## I.      INTRODUCTION

This case is about preventing and correcting harassment on the basis of sex and ensuring that the public servants of the City of Beech Grove City enjoy equal protection under the law. Plaintiffs Julie Lockwood and Linda Mohr have worked for the City of Beech Grove for a combined total of forty years. They both used to enjoy a harassment-free workplace, until Dan McMillan became the Clerk Treasurer on January 1, 2012. For the past four years, Ms. Lockwood and Ms. Mohr have endured constant harassment on the basis of sex. They have stuck it out, while at least seven other female employees have resigned their employment because of harassment from Mr. McMillan.

Ms. Mohr and Ms. Lockwood have done everything within their power to bring Mr. McMillan's harassment to a halt. They reported the harassment and the City hired Ogletree

Deakins to conduct an investigation. The June 6, 2014 internal investigation revealed a consistent theme of complaints concerning Mr. McMillan's treatment of women and recommended four options for addressing the problem, including policy changes and training. Nevertheless, the City failed to act and Ms. Lockwood and Ms. Mohr filed EEOC charges of discrimination and then the present lawsuit. The harassment continues to persist, and the City has failed to implement an effective anti-harassment policy with reliable reporting means and failed to coach or provide training to Mr. McMillan and other employees. Mr. McMillan's harassment must stop.

Defendant City of Beech Grove and Defendant Dan McMillan have both filed motions for summary judgment. Because Mr. McMillan has incorporated by reference applicable arguments made by the City [*See* Dkt. 68 at ¶ 5] and because of the interests in judicial economy, Plaintiffs have addressed both motions for summary judgment together in this response brief. Plaintiffs respectfully request that this Court deny Defendants' motions for summary judgment and allow a jury to resolve the genuine issues of material fact and change the way female employees are treated in City employment in Beech Grove, Indiana.

## II.     STATEMENT OF FACTS

### 1.     Ms. Mohr and Ms. Lockwood's history working for the City of Beech Grove

Julie Lockwood started working for the City of Beech Grove on April 2, 1994. [Filing No. 85-1 at 4 (Lockwood Dep. at p. 12, lines 5-8.)]  Ms. Lockwood was originally hired as a secretary at the fire department. [Filing No. 85-1 at 4 (Lockwood Dep. at p. 11, lines 2-4.)]  Throughout her twenty-two years of employment at the City, Ms. Lockwood has worked at the fire department, the Clerk Treasurer's office, and the Mayor's office. [Filing No. 85-1 at 4 (Lockwood Dep. at p. 11, lines 16-18.); Filing No. 85-1 at 5 (Lockwood Dep. at p. 15, lines 12-14.)]  Linda Mohr started working for the City of Beech Grove on February 2, 1998. [Filing No. 85-4 at 4 (Mohr Dep. at p.

2

12, lines 21-23.)]   In 1998, Mayor Warner Wylie hired Ms. Mohr and he was her original supervisor. [*Id.* (Mohr Dep. at p. 12, lines 3-4; p. 13, lines 3-5.)]  Throughout her eighteen years of employment at the City, Ms. Mohr has always worked at the sewage works department. [*Id.* (Mohr Dep. at p. 11, lines 13-24.)]

### 2.    City of Beech Grove Personnel Manual

The City of Beech Grove maintains a Personnel Manual that applies to all city employees, including the employees who work in the Clerk Treasurer's office. [Filing No. 85-6 at 4 (McMillan Dep. at p. 11, lines 18-21.); Filing No. 85-9 and Filing No. 85-10.] Mr. McMillan described the employee personnel manual as follows: "It's very lax; I'll tell you that right now. That was one of the things that I think needed upgraded from day one." [Filing No. 85-6 at 4 (McMillan Dep. at p. 11, lines 21-23.)]  Mr. McMillan further testified that the personnel manual is outdated by maybe twenty years or more. [*Id.* (McMillan Dep. at p. 12, lines 1-4.)]

### 3.    Ms. Mohr's Duties as a clerk in the Sewage Works Department

As a clerk in the Sewage Works Department, Ms. Mohr is responsible for entering the sewer bills payments, waiting on customers, balancing the drawer, answering phone calls, and working on liens. [Filing No. 85-4 at 5 (Mohr Dep. at p. 15, lines 3-5.)]  Sewer, trash, and storm water are all now on one bill. [*Id.* (Mohr Dep. at p. 16, lines 13-14.)] The City bills citizens for these services every month. [*Id.* (Mohr Dep. at p. 16, line 14.)] When payments are not made and they become ninety days past due, the City starts the lien process. [*Id.* (Mohr Dep. at p. 16, lines 15-17.)] The City first sends out a notification, then certified notice, and then files a lien against the property owner. [*Id.* (Mohr Dep. at p. 16, lines 17-22.)] Ms. Mohr's position involves a lot of inputting billing information into the sewer billing system. [Filing No. 85-4 at 14 (Mohr Dep. at p. 49, lines 16-17.)] Before 2012, Ms. Mohr enjoyed working in the Sewage Works Department

and testified that the office "had a nice atmosphere." [Filing No. 85-4 at 11 (Mohr Dep. at p. 39, lines 5-6.)]

### 4. Ms. Lockwood's duties in her various City positions

From 1994 though 2004, Ms. Lockwood was a secretary in the fire department. In 2004 Ms. Lockwood began working in the Clerk Treasurer's office. [Filing No. 85-1 at 4 (Lockwood Dep. at p. 11, lines 2-4 and 17-18.)] She worked in the Clerk Treasurer's office for eight years and then transferred to the Mayor's office. [Filing No. 85-1 at 5 (Lockwood Dep. at p. 15, lines 12-14.)] Mayor Dennis Buckley asked Ms. Lockwood to be his assistant. [*Id.* (Lockwood Dep. at p. 15, lines 12-14.)] As the Mayor's assistant, Ms. Lockwood did a lot of copying, scanning, typing ordinances, making appointments, and getting packages ready for the city council and board or works. [Filing No. 85-1 at 9 (Lockwood Dep. at p. 31, lines 14-20.)] Ms. Lockwood had to turn in payroll to the Clerk Treasurer's office and go over to the Clerk Treasurer's office to use the scanner because her office did not have a scanner. [*Id.* (Lockwood Dep. at p. 31, lines 1-2; 21-24.)] Ms. Lockwood also used the restroom on the Clerk Treasurer's side of the building because it was the closest restroom and was on the same floor. [Filing No. 85-1 at 10 (Lockwood Dep. at p. 35, lines 21-24.)] The only other functioning restroom that Ms. Lockwood had access to was up two flights of stairs. [*Id.* (Lockwood Dep. at p. 35, lines 21-24.)] In 2012, Ms. Lockwood was paid out of the Clerk Treasurer's office, and for that payment she was supposed to help with any of the questions the employees in that office had. [Filing No. 85-6 at 9 (McMillan Dep. at p. 30, lines 13-18.); Filing No. 85-1 at 9 (Lockwood Dep. at p. 30, line 11.)]

### 5. Dan McMillan became Clerk Treasurer January 1, 2012

Dan McMillan started as Beech Grove's Clerk Treasurer on January 1, 2012. [Filing No. 85-6 at 3 (McMillan Dep. at p. 6, lines 7-9.)] Mr. McMillan described his role as follows: "We're

4

the HR Department of the city. We pay all the bills in the city, manage the sewer utility. I'm trying

to think. Do insurances, you know, health and liability." [*Id.* (McMillan Dep. at p. 6, lines 7-9.)]

When Mr. McMillan became the Clerk Treasurer, there were already two employees working in

the office – Heather Brown on the corporate side and Ms. Mohr on the sewer side. [Filing No. 85-

6 at 4 (McMillan Dep. at p. 10, lines 1-4.)]  The salaries of the employees in the Clerk Treasurer's

office are set in a Salary Ordinance that is given to the Mayor, and then the Mayor gives it to the

Council and they have the authority to approve the salaries. [Filing No. 85-6 at 6 (McMillan Dep.

at p. 19, lines 19-25.)] Mr. McMillan testified that as Clerk Treasurer he has authority to make

policy. [Filing No. 85-6 at 4 (McMillan Dep. at p. 11, lines 11-13.)]

**6.     Mr. McMillan sought hiring authority from Board of Works in January 2012**

Mr. McMillan went to the Beech Grove Board of Works for approval of hiring decisions.

[Filing No. 85-6 at 4 (McMillan Dep. at p. 10, lines 22-23.)]  On January 3, 2012, the Beech Grove

Board of Works held a meeting in which all three members of the Board of Works were present,

including: Dave Harrison, Sandra Seward, and Mayor Buckley. [Filing No. 85-11 at 1.] Mr.

McMillan and City Attorney, Craig Wiley were also present. [*Id.*] The minutes from this meeting

state, "Clerk Treasurer Dan McMillan presented a letter requesting permission to fill the vacant

position created by the transfer of Julie Lockwood." [*Id.* at 2.] Mr. McMillan also requested

permission to hire Joann Brewington and another part-time clerk. [*Id.*] The Board of Works

approved these hiring decisions by making a motion, seconding, and voting on the motion. [*Id.*]

**7.     As early as 2012, Mr. McMillan began harassing female employees**

From the time that Mr. McMillan became the Clerk Treasurer through the present, there

have been at least seven female employees in the Clerk Treasurer's office who have resigned their

employment from the City of Beech Grove. [Filing No. 85-4 at 17 (Mohr Dep. at p. 64, lines 19-

22.)] These women have left, all quit, because of the way Mr. McMillan treats women, the way he talks to women. [*Id.* (Mohr Dep. at p. 64, lines 19-22)] In 2012, Mr. McMillan told Ms. Lockwood that he did not want her on his side of the building. [Filing No. 85-1 at 6 (Lockwood Dep. at pp. 17-18, lines 25-2.)]

**8.      Ms. Mohr experienced daily harassment from Mr. McMillan**

Ms. Mohr described the harassment as follows, "It is just a daily basis. I mean, at one point, he wouldn't even look at me when we would cross paths in the hallway. He would turn his head and keep walking. Just constant belittling. He would yell at other employees. He belittled and yelled at Heather so much – Heather Brown – she finally resigned after almost a year of it." [Filing No. 85-4 at 17 (Mohr Dep. at p. 63, lines 3-9.)] At the top of his voice, yelling, Mr. McMillan called Ms. Mohr a bold-faced liar while there was a customer in the office. [*Id.* (Mohr Dep. at p. 62, lines 21-25.)] Ms. Mohr believes Mr. McMillan intimidates her and others because she is a woman and he knows he can. [*Id.* (Mohr Dep. at p. 64, lines 1-4.)] Ms. Mohr was in tears, the way that Mr. McMillan was treating her and the other females in the office. [Filing No. 85-4 at 20 (Mohr Dep. at p. 75, lines 4-6.)]  Ms. Mohr discussed the allegations of this lawsuit with several department heads in her office, and Mr. McMillan responded by removing the door from Ms. Mohr's office. [Filing No. 85-4 at 24 (Mohr Dep. at p. 92, lines 14-25; p. 93, lines 1-3.)]

**9.      Four female employees resign employment in the Clerk Treasurer's office**

After working for the City of Beech Grove for nine years, Heather Brown resigned on June 27, 2012. [Filing No. 85-12 at 1.] Joann Brewington, Sheri Morgan, and Susan Speer all resigned in March 2013. [Filing No. 85-12 at 1.] Joann Brewington had to take Ed Bell in the office with her to resign because she was so afraid of Mr. McMillan. [Filing No. 85-2 at p. 6 (Lockwood Dep. at p. 106, lines 22-24.)]

**10.      Ms. Lockwood experienced constant harassment from Mr. McMillan**

Ms. Lockwood experienced constant harassment from Mr. McMillan. [Filing No. 85-1 at 14 (Lockwood Dep. at p. 52, lines 9-12.)] For example, Mr. McMillan harassed Ms. Lockwood when she attempted to use the restroom. [*Id.* (Lockwood Dep. at pp. 49-50, lines 25-1.)]  On June 24, 2013, Ms. Lockwood began documenting Mr. McMillan's harassment through handwritten entries. [Filing No. 85-1 at 15 (Lockwood Dep. at p 54, lines 5-10; Filing No. 85-13)]  On June 24, 2013, Mr. McMillan slammed and locked the door as Ms. Lockwood was exiting the Clerk Treasurer's office. [*Id.* (Lockwood Dep. at pp. 54-55, lines 20-5.)]  Incidents like this had occurred prior to June 24, 2013, and Ms. Lockwood testified that she started writing the incidents down because it was getting ridiculous the way that Mr. McMillan was treating her. [*Id.* (Lockwood Dep. at p. 55, lines 15-21.)] Ms. Lockwood's notes document over forty-five incidents of harassment. [Filing No. 85-13 at 1-10)] Ms. Lockwood testified that Mr. McMillan does not like women and gets irate and very hateful when a woman asks a question. [Filing No. 85-2 at 5 (Lockwood Dep. at p. 102, line 4; p. 103, lines 11-12.)] Ms. Lockwood further testified that Mr. McMillan is very in your face, puffed up, and does not do that to men. [Filing No. 85-2 at 6 (Lockwood Dep. at p. 106, lines 5-6.)] Ms. Lockwood said, "Dan is very intimidating to women and I think the women are afraid of him. He makes me a nervous wreck. He makes me shake all over." [Filing No. 85-2 at 11 (Lockwood Dep. at p. 127, lines 6-8.)]

**11.      Mr. McMillan demanded Ms. Lockwood stay out of his side of the building**

Mr. McMillan emailed Mayor Buckley and carbon copied Ms. Lockwood on June 20, 2013. [Filing No. 85-14 at 1.] Mr. McMillan wrote, "Months ago I came to you and asked you to please keep your assistant [Ms. Lockwood] on your side of the building due to problems she was causing with employees. I am once again going to ask you to please have your assistant use the

restroom facilities and copier that is on your side of the building. I do not want her in the clerks office building at any time." [*Id.*] Again, Mr. McMillan emailed Mayor Buckley and Ms. Lockwood, directly on August 12, 2013. [Filing No. 85-14 at 1.] Mr. McMillan wrote, "I have asked you multiple times to please keep Julie on your side of the office and away from the employees in the clerks office. I witnesses her this morning whispering to Brenda; which is not only rude, but unnecessary. I have been more than patient and shown more tolerance of her undermining behavior out of respect for you, Dennis. I will not put up with it any longer. This is the last time. I do not want her in my offices." [*Id.*]  The Clerk Treasurer's office issues the Mayor's paycheck, which is a physical check. [Filing No. 85-6 at 21 (McMillan Dep. at p. 80, lines 19-23.)] When asked whether it was acceptable for Ms. Lockwood to come over to Mr. McMillan's side of the building to pick up the Mayor's check, Mr. McMillan answered, "I would rather that not happen, but she still does. She still comes to the restroom every day and has every day; so nothing has changed." [Filing No. 85-6 at 17 (McMillan Dep. at p. 64, lines 1-3)]

### 12.   Brenda Michaels resigned on November 15, 2013 citing unequal treatment

On November 15, 2013, Brenda Michaels submitted her resignation to Mr. McMillan. [Filing No. 85-15 at 1.] Ms. Michaels gave two weeks' notice and stated, "Over the past eight months, I received very little instruction on how to carry out my duties, yet a significant amount of criticism and blame. I am no longer comfortable working in the type of environment where asking for advice or direction often leads to discourteous and threating e-mails…This along with unequal treatment of employees is what has made my resignation necessary." [*Id.*] Ms. Michaels left because she was treated so poorly by Mr. McMillan. [Filing No. 85-5 at 10 (Mohr Dep. at p. 141, lines 10-18.)]

### 13.   Ms. Mohr and Ms. Lockwood complained about Mr. McMillan's harassment to Ed Bell, President Pro Tempore, and Mayor Buckley

8

In 2013, Ms. Mohr and Ms. Lockwood reported Mr. McMillan's harassment to Ed Bell, President Pro Tempore, and Mayor Buckley. [Filing No. 85-4 at 20 (Mohr Dep. at p. 75, lines 21-25.); Filing No. 85-2 at 13 (Lockwood Dep. at pp. 134, lines 18-20; pp. 137, lines 7-8.)] Ms. Mohr specifically reported that Mr. McMillan's harassment was happening because she was a woman. [Filing No. 85-4 at 22 (Mohr Dep. at p. 82, lines 9-12.)] Ms. Mohr believed this because of the way Mr. McMillan treated her, plus the pattern of all the other women that he had treated that way. [*Id.* (Mohr Dep. at p. 82, lines 18-22.)] Ms. Mohr testified that she just could not take it anymore; it was not fair. [Filing No. 85-4 at 20 (Mohr Dep. at p. 75, line 22.)] Ms. Mohr talked to Mayor Buckley many times about Mr. McMillan's treatment and then went to Ed Bell as the next step. [*Id.* (Mohr Dep. at p. 76, lines 19-22; p. 77, lines 12-13.)] Ms. Mohr did not know what steps she could take, and Ms. Lockwood suggested that they could go talk to Ed Bell. [Filing No. 85-4 at 21 (Mohr Dep. at p. 78, lines 5-9.)] In response to what she and Ed Bell discussed with respect to Mr. McMillan, Ms. Lockwood answered, "I told him that I felt that he treated me poorly. He treated women poorly. I told him that Linda had said this, Brenda had said things. Joann had said things, Janet had said things. I got copied, CC'd their letters, their resignation letters. I know he treated Heather horrible, horrible." Filing No. 85-2 at 14 (Lockwood Dep. at p. 137, lines 18-24.)] In 2013, there was no procedure in place for reporting harassment. [Filing No. 85-4 at 21 (Mohr Dep. at p. 77, lines 9-13.)]

**14.   Janet Moore resigned on April 7, 2014 citing poor treatment of women**

On April 7, 2014, Janet Moore submitted her resignation to Mr. McMillan. [Filing No. 85-16 at 1.] Ms. Moore wrote, "After a little research which didn't take a lot I realized there were 8-9 other women in this position prior to me within that past two years. That should tell you something. It's almost like you have something against women or maybe don't have this power at

home. I don't know but you simply do not treat people this way." [*Id.*] Ms. Moore left because she

was treated so badly by Mr. McMillan. [Filing No. 85-5 at 10 (Mohr Dep. at p. 141, lines 2-9.)]

Mr. McMillan described Ms. Moore as "combative" and "the type that came in and wanted to be

the boss on day one." [Filing No. 85-6 at 16 (McMillan Dep. at p. 60, lines 5-6, 25.)]

15.     **City of Beech Grove retained Ogletree Deakins to investigate allegations of former and current female employees regarding Mr. McMillan's harassment**

In April 2014, the City of Beech Grove retained Ogletree Deakins to investigate allegations

by current and former female employees that Mr. McMillan had harassed them. [Filing No. 85-17

at 1; Filing No. 85-18 at 1.] The April 25, 2014 engagement letter identifies the scope of services

as follows: "You asked us to represent you in connection with the investigation into allegations

against Dan McMillan." [*Id.*]

16.     **Internal Investigation report released on June 6, 2014**

On June 6, 2014, Amy Adolay of Ogletree Deakins released the Internal Investigation

report to Mayor Buckley, Ed Bell, and Craig Wiley. [Filing No. 85-18 at 1; *note*: Filing No. 35-1

is the same document with slightly larger font for ease of review] The nine-page Internal

Investigation stated, "Since taking office two and a half years ago, approximately ten employees,

all female, have come and gone from the Clerk/Treasurer's office." [Filing No. 85-18 at 1.] "The

investigation revealed a consistent theme of complaints concerning McMillan belittling, yelling,

intimidating, and speaking inappropriately toward employees of the City and Clerk/Treasurer's

office." [Filing No. 85-18 at 1.] "Although both males and females complained about McMillan's

demeanor in interacting with them, several females relayed their view that McMillan treats women

worse than men and simply does not like or respect women." [Filing No. 85-18 at 1.] The

investigation included witness interviews with nine current employees and five former employees.

[Filing No. 85-18 at 1.]

17.   **Internal Investigation Report Regarding Former Employees of Clerk/Treasurer's Office**

Section B of the June 6, 2014 Internal Investigation Report identified five former employees of the Clerk Treasurer's office: Janet Moore, Brenda Michael, Sherry Morgan, Joann Brewington, and Heather Brown. [Filing No. 85-18 at 5.] The report indicates Ms. Moore resigned on April 7, 2014 after only working for the City for four weeks because of Mr. McMillan's treatment, including his tone, yelling, and thinking he was one step higher than everyone else. [*Id.*] Ms. Michael resigned in November 2013 because of Mr. McMillan's poor treatment of her, including negative, bullying emails, yelling, and negative comments. [*Id.*] The report indicates that when Ms. Morgan resigned at the end of 2013, she said it was due to a family issue, but was actually due to Mr. McMillan's continued poor treatment of her. [*Id.* at 6.] Ms. Brewington resigned in March 2013 because of stress caused by Mr. McMillan. [*Id.*] Finally the Internal Investigation Report indicates that Ms. Brown left City employment after nine years because McMillan would yell, verbally abusive everyone, and was impossible to please. [*Id.*] The work environment in the Clerk Treasurer's office was bad and Ms. Brown had never been so depressed or low in her life as she was when working with Mr. McMillan. [*Id.*]

18.   **Internal Investigation Report Identifies Four Possible Options for Addressing Mr. McMillan's Conduct**

Section C of the June 6, 2014 Internal Investigation Report identified four possible options for addressing Mr. McMillan's conduct. [Filing No. 85-18 at 7.] Possible options included: (1) Indiana statutory measures addressing removal of elected officials; (2) Indiana statutes by which the City Council may limit the Clerk/Treasurer's power to hires; (3) political means, and (4) educating employees and elected officials on appropriate workplace conduct. [*Id.*] The Internal Investigation Report described each option in detail. [*Id.*] The fourth option was described as

attempting to prevent similar future conduct by training employees, especially Mr. McMillan, on appropriate and inappropriate workplace conduct and by individual coaching of Mr. McMillan. [*Id.* at p. 8] "Every employer should have a policy prohibiting sexual harassment, other forms of harassment, and discrimination and explaining how employees can complain about violations of the policy. The City of Beech Grove does not currently have such a policy, which opens up the City to greater liability for legal claims and eliminates important defenses to such claims. We recommend additional training for City employees and updating written policies." [*Id.*] The Internal Investigation Report concluded, "These measures should be considered and appropriate action, including but not limited to training and coaching taken in an effort to decrease the potential liability for the City." [*Id.* at p. 9]

**19.    Summary Report of Internal Investigation released on June 20, 2014**

On June 20, 2014, a summary three-page version of the Internal Investigation Report was released. [Filing No. 85-19 at 1.] The Summary Report stated, "The investigator also requested an interview with McMillan. While McMillan did not respond to the investigator's request for an interview, his attorney has contacted the City Attorney for the City of Beech Grove, Craig Wiley, concerning such request and this investigation. McMillan has not to date, however, agreed to be interviewed." [*Id.*] The Summary Report further stated, "When interviewed, former employees of the Clerk Treasurer's office complained that McMillan: treated them poorly; sent them negative, bullying, mean-spirited emails; was hateful towards the employees in his office; was arrogant and degrading; was impossible to please; was rude to people on the telephone; threw around his position; verbally abused them; made them dread coming to work; caused some of the significant stress and depression, including one who said she was sick to her stomach every time she saw McMillan's car and one who reported that she had never been as depressed in her life as when she

was working for McMillan; and was the reason that four of them resigned. [*Id.* at 3.] On June 23, 2014, Ms. Mohr also overhead Mr. McMillan talking on the phone and Mr. McMillan yelled that Ms. Lockwood is a "pain in the ass." [Filing No. 85-1 at 17 (Lockwood Dep. at pp. 63-64, lines 25-3); No. 85-13 at 1]

**20.    City Council held executive session after investigation**

After the internal investigation, the City Council held an executive session. [Filing No. 85-1 at 21 (Lockwood Dep. at p. 80, lines 5-8; Filing No. 85-12 at 4.)]  Ed Bell told Ms. Lockwood that "women exaggerate" was said at this meeting. [*Id.* (Lockwood Dep. at p. 97, lines 2-4; Filing No. 85-24 at 1.)]

**21.    City Council discussed investigation at July 7, 2014 meeting**

On July 7, 2014, the Beech Grove City Council held a meeting, which Mayor Buckley and Mr. McMillan both attended. [Filing No. 85-25 at 1.] Councilor Ed Bell's council comments related to the internal investigation of Mr. McMillan state, "The investigation is done. The Council, in executive session, has no other comments other than to let the report speak for itself. Anyone who would like a copy can request it by email or mail to City Hall at 806 Main Street, Beech Grove IN 46107, attention to Ed Bell President Pro Tempore."  [Filing No. 85-25 at 9.] Mr. McMillan's comments related to the internal investigation state, "Clerk Treasurer McMillan commented on the so-called investigation (he called it a witch hunt). He denied any and all accusations made in this report. It was all done anonymously. He was never asked to be interviewed until the investigation was completed…Council has spent approximately $6,000.00 on this investigation, and that money could have been better spent towards hiring a part-time person to answer non-emergency calls at the police station after 4 p.m. or to address many other needs in this city." [*Id.*] In his deposition, Mr. McMillan claimed that the investigation was all political, aimed to get him beat in the

November 2015 election. [Filing No. 85-6 at 17 (McMillan Dep. at p. 64, lines 25-22.)]  Mr. McMillan also testified that he did not change his behavior in any way as a result of the June 2014 Internal Investigation reports. [Filing No. 85-6 at 20 (McMillan Dep. at p. 76, lines 19-22.)] The City did not take any action to prevent sex harassment or change Mr. McMillan's conduct toward women. [Filing No. 85-5 at 8 (Mohr Dep. at p. 133, lines 21-22.)]  Ms. Mohr testified, "Nothing. They did nothing. As a result of the investigation, they were given many options of what could be done and they did nothing." [*Id.* (Mohr Dep. at p. 133, lines 22-24.)]

### 22. Ms. Lockwood and Ms. Mohr filed charges of discrimination when the City and Mr. McMillan refused to do anything to stop the harassment

On July 24, 2014, Ms. Lockwood and Ms. Mohr filed charges of discrimination with the EEOC alleging sex harassment as continuing actions. [Filing No. 85-21 at 1; Filing No. 85-22 at 1.]  The charges both stated, "An internal investigation by the Beech Grove City Council revealed a consistent theme of complaints by women concerning McMillan's aggressive behavior. Nevertheless, the City of Beech Grove has not taken action to stop McMillan's hostility toward women." [*Id.*] Mr. McMillan himself testified that his behavior did not change at all after finding out about the EEOC charges. [Filing No. 85- 6 at 13 (McMillan Dep. at p. 47, lines 19-21.)]  When asked why Ms. Mohr waited until July 24, 2014 to file her charge when the harassment began in 2012, Ms. Mohr responded as follows, "I'm not going to react over one incident. It started in February/March 2012. But it continued, continuously, daily for a year and a half before I even took it to Ed Bell. Then they did an investigation. Even after the results of the investigation, nothing was done. So this was the only step we could take." [Filing No. 85-4 at 23 (Mohr Dep. at p. 86, lines 16-22.)]  Ms. Lockwood testified that she filed her EEOC charge after she found out that nothing was going to be done to stop the harassment. [Filing No. 85-2 at 15 (Lockwood Dep. at p.

14

148, lines 3-4.)] Ms. Lockwood went outside, sat in her car, cried, and called an attorney's office. [*Id.* (Lockwood Dep. at p. 148, lines 7-10.)]

### 23.     Mr. McMillan's harassment continues to persist

Mr. McMillan's behavior did not change in any positive way after the EEOC charges were filed. [Filing No. 85-3 at 1 (Lockwood Dep. at p. 151, lines 4-6.)]  Ms. Lockwood continued to document specific incidents of harassment after she and Ms. Mohr filed their EEOC charges. [Filing No. 85-1 at 21 (Lockwood Dep. at p. 78, lines 20-24.)]  For example, on October 3, 2014, Ms. Lockwood noted that Ms. Mohr was visibly upset and shaken after being called into Mr. McMillan's office. [Filing No. 85-1 at 20 (Lockwood Dep. at pp. 75-76, lines 23-1.)] After Ms. Lockwood and Ms. Mohr filed their EEOC charges, Mr. McMillan started bypassing Ms. Lockwood to get to the Mayor. [Filing No. 85-1 at 21 (Lockwood Dep. at p. 80, lines 21-23.)] On June 9, 2016 at her deposition, Ms. Lockwood testified, "He [Mr. McMillan] hasn't backed down. He hasn't changed. He still treats me the same way. He still treats Linda the same way." [Filing No. 85-2 at 16 (Lockwood Dep. at pp. 146-147, lines 25-4.)]

## III.     STATEMENT OF MATERIAL FACTS IN DISPUTE

### 1.     Whether the Beech Grove Employee Handbook Has Been Changed

A genuine issue of material fact exists regarding whether the Beech Grove Employee Handbook now contains an anti-harassment policy and reliable reporting means.   In his Declaration, Mayor Buckley states, "After the Ogletree report was issued, the city council passed General Ordinance No. 14, 2014 addressing employee sexual harassment." [Filing No. 63-1 at 3 ¶ 6.] Mayor Buckley states that he supported the ordinance. [*Id.*] The actual ordinance however, lacks an effective date, and simply states, "this ordinance shall go into effect immediately upon passage by the Common Council, signed by the Council President, attested by the Clerk Treasurer

and signed by the Mayor." [Filing No. 63-3 at 3.] There is no evidence that the ordinance was signed by the Council President, attested by the Clerk Treasurer, and signed by the Mayor, as required in order for the ordinance to take effect. Further, there is no evidence of the actual Beech Grove Employee Handbook that contains this language, or that Beech Grove Employees received any notice or training regarding the anti-harassment policy. When asked in his June 22, 2016 deposition whether Mr. McMillan knew when the ordinance became effective, he answered: "No. It was approximately a year ago. I couldn't give you that information." [Filing No. 85-6 at 24 (McMillan Dep. at p. 92, lines 2-3)]   Absent evidence of when or if General Ordinance No. 14, 2014 actually went into effect, a genuine issue of material fact exists with respect to whether Beech Grove actually changed its policies and added an anti-harassment policy or effective means of reporting harassment to its Employee Handbook.

### 2.    Whether the City of Beech Grove could have provided harassment training

A genuine issue of material fact exists regarding whether the City of Beech Grove could have provided harassment training to its employees. In its summary judgment brief, the City suggests that training was not an option. A reasonable jury, however, could evaluate the evidence and come to a different conclusion. Mr. McMillan testified that he has never had any training on equal employment opportunity laws. [Filing No. 85-6 at 24 (McMillan Dep. at p. 90, lines 9-11)] Mr. McMillan explained his knowledge of laws that prohibit employment discrimination as follows: "Just general knowledge. I've owned numerous businesses, and I've just looked at different things like that. I get things in the mail. But just general knowledge." [*Id.* (McMillan Dep. at p. 90, lines 9-11)] Mr. McMillan further testified that neither Mayor Buckley nor any of the City Council members have ever talked to him about his behavior toward women. [*Id.* (McMillan Dep.

at p. 90, lines 9-11)] A reasonable jury could evaluate this evidence and find that the City could have provided counseling or training to Mr. McMillan and the rest of the Beech Grove workforce.

### 3.    Whether Ms. Mohr is a protected City employee or an appointed policymaker

A genuine issue of material fact exists regarding whether Linda Mohr is a City employee or an appointed policymaker that authorizes meaningful input into governmental decision-making on issues where there is room for principled disagreement. In its summary judgment brief, the City switches back and forth between calling Ms. Mohr the wastewater clerk or a deputy clerk-treasurer. Neither Ms. Mohr nor Mr. McMillan utilizes this characterization. Ms. Mohr testified that she is a clerk in the Sewage Works Department and is responsible for entering the sewer bills payments, waiting on customers, balancing the drawer, answering phone calls, and working on liens. [Filing No. 85-4 at 5 (Mohr Dep. at p. 15, lines 3-5.)]  Mr. McMillan described Ms. Mohr as working in the Sanitation Department, elaborating that she does the billing for the City for sewer bills. [Filing No. 85-6 at 10 (McMillan Dep. at p. 36, lines 1-6)]  The jury should evaluate the evidence and determine whether Ms. Mohr's position involved any policymaking or whether Ms. Mohr's position was primarily data entry.

### 4.    Whether Mr. McMillan ever gave Ms. Mohr the April 4, 2013 discipline letter

A genuine issue of material fact exists regarding whether Mr. McMillan ever gave Ms. Mohr a letter dated April 4, 2013 that started by stating "This letter shall serve as formal notification that a verbal warning is being given to you." [Filing No. 85-23 at 1.] Ms. Mohr testified that the first time she ever saw this April 4, 2013 letter from Mr. McMillan to her was at her June 9, 2016 deposition. [Filing No. 85-4 at 14 (Mohr Dep. at p. 51, lines 8-16.)] When questioned about whether he ever gave a copy of this letter to Ms. Mohr, Mr. McMillan answered, "I would think so, yes." [Filing No. 85-6 at 11 (McMillan Dep. at p. 39, lines 8-10.)] Mr. McMillan could

17

not recall where he was when he gave the letter to Ms. Mohr or whether there was anyone else around. [*Id.* p. 39, lines 13-18.] Further, in explaining what he meant by "insubordination," Mr. McMillan stated that he thought Ms. Mohr was "combative." [*Id.* p. 40, lines 2-8.] In its brief, the City of Beech Grove claims that Ms. Mohr's difficulties with Mr. McMillan "appear to be related to work performance in the clerk-treasurer's office not her sex." [Filing No. 67 at 30.]  A genuine issue of material fact exists regarding whether Mr. McMillan's motive for harassing Ms. Mohr was based on sex or work performance when he failed to give Ms. Mohr notice of alleged performance deficiencies, called Ms. Mohr "combative," and demonstrated a pattern of hostility toward women.

### 5.   Whether Mr. McMillan's treatment of family and friends negates his hostility toward other women

A genuine issue of material fact exists regarding whether the fact that Mr. McMillan spared family and friends of harassment negates his pattern of hostility toward women in the workplace. Defendants suggest that because there were two women who were not victims of such severe harassment, then Mr. McMillan cannot harbor hostility toward other women on account of sex. Yet, the two women who were not subject to as much hostility were friends and family of Mr. McMillan. Peggy Fitzgerald and Mr. McMillan had been friends for years. [Filing No. 85-5 at 2 (Mohr Dep. at p. 109, lines 24-25.)]  The June 6, 2014 Internal Investigation Report reported that according to Peggy's husband, Mike Fitzgerald (now deceased), Peggy gets preferential treatment because Mr. McMillan knows that Mike Fitzgerald would not put up with it. [Filing No. 85-__ at 4]  The Report further explained that Peggy has witnessed the way that Mr. McMillan speaks to other employees and told Mike Fitzgerald about it. [*Id.*] Debbie Springer is Mr. McMillan's cousin's daughter. [Filing No. 85-6 at 9 (McMillan Dep. at p. 29, lines 5-6)]  A jury should evaluate

what weight to assign to the fact that two women who were friends and family were spared of harassment, while at least nine other women suffered from Mr. McMillan's harassment.

  **6.**  **Whether Mr. McMillan refused to participate in the Internal Investigation**

  A genuine issue of material fact exists regarding whether Mr. McMillan refused to respond to the investigator's request to interview him as part of the Internal Investigation regarding allegations of former and current female employees in the Clerk Treasurer's office. Mr. McMillan claims that he was never contacted by Ogletree Deakins for an interview nor instructed by anyone to refuse an interview. [Filing No. 85-6 at 19 (McMillan Dep. at p. 70, lines 7-16.)] The June 20, 2014 report however states, "The investigator also requested an interview with McMillan. While McMillan did not respond to the investigator's request for an interview, his attorney has contacted the City Attorney for the City of Beech Grove, Craig Wiley, concerning such request and this investigation. McMillan has not to date, however, agreed to be interviewed." [Filing No. 85-19 at 1.] The jury should evaluate this evidence and determine whether Mr. McMillan's testimony is credible, or whether he refused to participate in the investigation that he described as a "witch hunt."

  **7.**  **Whether this lawsuit was filed to influence the 2015 election, or to change Mr. McMillan's behavior toward women and implement training and new policies at the City of Beech Grove to prevent sex harassment and provide reliable reporting means**

  A genuine issue of material fact exists regarding the motivation of Ms. Mohr and Ms. Lockwood for filing this lawsuit. Defendants suggest that Ms. Mohr and Ms. Lockwood were motivated by a desire to affect the outcome of the 2015 Beech Grove election. Both Ms. Mohr and Ms. Lockwood denied any political motivation. Ms. Mohr stated at the time that she filed her EEOC charge she had no idea that Mr. McMillan was even going to run for reelection. [Filing No. 85-5 at 1 (Mohr Dep. at p. 108, lines 4-68)]  When asked what she wanted to see her happen with

her lawsuit, Ms. Mohr testified, "I want to see him admit that he's in the wrong. I want to see him have some kind of training that will change his behavior towards women. I don't want anyone else to have to go through this, because it's not fair. It's not right. And I would like to see the policies changed at the City of Beech Grove level as far as this kind of thing." [*Id.* (Mohr Dep. at p. 108, lines 9-16.)] Ms. Lockwood testified that the lawsuit was not filed to influence the outcome of the election in any way. [Filing No. 85-3 at 12 (Lockwood Dep. at pp. 196-197, lines 20-1.)] Ms. Lockwood testified that she expected for Mr. McMillan to go through some kind of harassment training. [Filing No. 85-2 at 15 (Lockwood Dep. at p. 144, lines 19-21.)] This Court should allow a reasonable jury to weigh the evidence and decide whether Plaintiffs were politically motivated as Defendants suggest, or whether Plaintiffs truly wanted to change the policies, procedures, and training practices at the City of Beech Grove to ensure a work environment free of harassment that promotes equal protection under the law.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" designated evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on summary judgment motions on employment cases, the Seventh Circuit has recently cautioned about the proposition that evidence must be sorted into different piles, labeled "direct" and "indirect" that are evaluated differently. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). "Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Id.*

V.    **ARGUMENT**

A.    **This Court should deny Defendant City of Beech Grove's motion for summary judgment because Plaintiffs have produced sufficient evidence from which a reasonable jury could infer sex harassment in violation of Title VII.**

Plaintiffs have produced sufficient evidence from which a reasonable jury could infer harassment on the basis of sex. On a claim of sex harassment based on hostile work environment claim, a plaintiff must establish four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) her gender must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability. *See Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). The Seventh Circuit considers the hostile work environment claim under a "totality of the circumstances" approach. *See Boss v. Castro,* 816 F.3d 910, 920 (7th Cir. 2016); *Hall v. City of Chicago,* 713 F.3d 325, 331 (7th Cir. 2013) (courts should not carve up incidents of harassment then separately analyze each one). The critical question is whether a reasonable jury could return a verdict for the plaintiffs. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

1.    **A reasonable jury could find that Mr. McMillan's behavior was unwelcome by at least nine women.**

Plaintiffs have produced sufficient evidence from which a reasonable jury could find that the work environment was both subjectively and objectively offensive. Both Plaintiffs complained about the harassment to Mayor Buckley and Council President Pro Tempore Ed Bell. At least seven women resigned because they could no longer endure the harassment. The June 2014 investigation revealed that Mr. McMillan's behavior was objectively offensive to others who witnessed the harassment. In light of all of this evidence, a reasonable jury could find that the work environment was both subjectively and objectively offensive.

### 2. A reasonable jury could find that Mr. McMillan's hostile treatment of women was because of sex.

If a supervisor treated all women hostilely, both the U.S. Supreme Court and the Seventh Circuit permit an inference that the actor was motivated by their gender. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998); *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). Plaintiffs have produced evidence regarding a widespread pattern of harassment of women in the City of Beech Grove by Mr. McMillan. A reasonable jury could evaluate this widespread pattern and infer that Mr. McMillan's harassment was because of sex.

### 3. A reasonable jury could find that Mr. McMillan's behavior was severe or pervasive.

Hostile work environment harassment is established where the offensive conduct is so severe or pervasive as to constructively alter the employee's working conditions – even absent actual or threatened economic injury. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67-68 (1986). It is sufficient if the environment reasonably would be perceived as, and the complainant did perceive it to be, hostile or abusive. *See Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993). A hostile environment claimant need not necessarily prove that the harassment actually interfered with her work performance. *Id.* Although a hostile work environment claim may be grounded in the actions of co-workers or even nonemployees, courts have held that conduct is more severe when a supervisor engages in it. *See Hertzberg v. SRAM Corp.*, 261 F.3d 651, 654-55 (7th Cir. 2001)(co-worker); *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 692 (7th Cir. 2005)(contractors); *Gentry v. Export Packaging Co.*, 238 F.3d 842, 851 (7th Cir. 2001)(supervisor).

Plaintiffs have put forth sufficient evidence from which a reasonable jury could find that the harassment they suffered was severe and pervasive. Plaintiffs have put forth evidence establishing a pattern of harassment of at least nine women. Each female employee suffered from

Mr. McMillan's constant harassment including evidence that Mr. McMillan: "treated them poorly; sent them negative, bullying, mean-spirited emails; was hateful towards the employees in his office; was arrogant and degrading; was impossible to please; was rude to people on the telephone; threw around his position; verbally abused them; made them dread coming to work; caused some of the significant stress and depression, including one who said she was sick to her stomach every time she saw McMillan's car and one who reported that she had never been as depressed in her life as when she was working for McMillan." Ms. Lockwood herself wrote down over forty-five specific incidents that constituted pervasive harassment. In light of all of the evidence, Plaintiffs have presented sufficient evidence from which a reasonable jury could find that Plaintiffs and seven other female employees suffered severe or pervasive harassment.

> **4.    A reasonable jury could find that the City of Beech Grove is responsible for Mr. McMillan's harassment of women because it had no reliable anti-harassment policy, no reporting procedure, and failed to take corrective action in response to an investigation that showed a pattern of hostile treatment of female employees.**

An employer may avoid liability if it can prove the two elements of the *Faragher/Ellerth* affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *EEOC v. Management Hospitality of Racine*, 666 F.3d 422, 433 (7th Cir. 2012)(quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

> **a.    The City of Beech Grove did not exercise reasonable care to prevent or correct promptly any sexually harassing behavior.**
>
> **i.    The City of Beech Grove did not exercise reasonable care to prevent sex harassment.**

At the time that Ms. Lockwood and Ms. Mohr reported Mr. McMillan's harassment to Mayor Buckley and Council President Pro Tempore, Ed Bell, the City of Beech Grove did not even have an anti-harassment policy or any reporting mechanisms in place. Ms. Mohr testified that she did not know what to do, so she first talked to Mayor Buckley and then Ed Bell. When the City ignored the results of the Internal Investigation, Ms. Lockwood and Ms. Mohr went to the EEOC. In the absence of an anti-harassment policy or training on laws that prohibit discrimination and harassment in the workplace, a reasonable jury could find that the City of Beech Grove did not exercise reasonable care to prevent sex harassment.

### ii. The City of Beech Grove did not exercise reasonable care to correct sex harassment.

A reasonable jury could find that the City of Beech Grove did not exercise reasonable care to correct the sex harassment. Ms. Mohr and Ms. Lockwood complained about the sex harassment in 2013, yet it was not until April 2014 that the City of Beech Grove hired Ogletree Deakins to investigate the harassment. The Seventh Circuit has held that an investigation that did not commence until two months after plaintiff's complaint was not sufficiently prompt. *See EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 436 (7th Cir. 2012). Further, after the City of Beech Grove received the results of the investigation – which revealed a consistent theme of complaints of Mr. McMillan belittling, yelling, intimidating, and speaking inappropriate toward women – the City took no action. The City's inaction is even more egregious considering that Ogletree Deakins presented many options for remedying the situation.

Viewing the facts in the light most favorable to Ms. Mohr and Ms. Lockwood, the City of Beech Grove did not engage in good faith efforts to implement an anti-harassment policy with reliable reporting mechanisms. The City has provided evidence that sometime in 2014 it attempted to pass an Ordinance amending the Beech Grove Employee Manual. Nevertheless, the City has

24

not demonstrated the effective date of this policy, or that this policy is even in effect. Further, the City has not shown that it has actually implemented this policy through notice to the employees or training in the new policy or means to prevent harassment. The Seventh Circuit has found a genuine issue of material fact where sex harassment training is given at an organization, yet the training practices were still inadequate. *See e.g. EEOC v. Management Hospitality of Racine, Inc.*, 666 F.3d 422, 435 (7th Cir. 2012)(assistant manager's testimony that she never received sex harassment training, even though she was responsible for orientation and training of new employees, raises issue of fact as to whether employer's training practices were adequate). The City of Beech Grove has not produced any evidence demonstrating that any type of sex harassment training was ever offered or required of City employees. Based on this evidence, a reasonable jury could find that the City of Beech Grove was negligent in response to Plaintiffs' harassment complaints.

                       iii.    **The City of Beech Grove did not provide any preventative or corrective opportunities that Plaintiffs failed to take advantage of.**

Ms. Mohr testified that she had no idea what to do to report the harassment. Ms. Mohr's testimony is not surprising because the City of Beech Grove did not have any anti-harassment policy or any procedure for reporting harassment. Ms. Mohr and Ms. Lockwood reported Mr. McMillan's harassment to Mayor Buckley and the Council President Pro Tempore, Ed Bell. In light of this evidence, a reasonable jury could find that Plaintiffs did not fail to take advantage of any preventive or corrective opportunities, but rather, were proactive about attempting to do anything within their power to make Mr. McMillan's harassment stop.

                   5.    **Both Plaintiffs are long-term employees of the City of Beech Grove and protected from sex harassment under Title VII.**

i.    **Ms. Lockwood may not be the victim of harassment simply because she changed positions within the City in 2012.**

In support of its motion for summary judgment, the City of Beech Grove argues that it should evade Title VII liability for Ms. Lockwood's claim because Ms. Lockwood is subject to the "personal staff" exemption. Ms. Lockwood has presented sufficient evidence to create a genuine issue of fact on this issue. First, Ms. Lockwood was not appointed by the Mayor or brought on board by the Mayor. Rather, Ms. Lockwood had worked at the City of Beech Grove for seventeen years when the Mayor asked her to transfer into his office. Ms. Lockwood was paid out of the Clerk Treasurer's office in 2012 and helped train the employees in that office. Further, the "personal staff" exemption is properly used in cases alleging an adverse employment action, but the "personal staff" exemption cannot be used to justify sex harassment. Plaintiff's Counsel is not aware of any cases in which the "personal staff" exemption has been used to shield an elected official from being allowed to harass female employees on the basis of sex. This Court should allow the jury to evaluate the evidence and determine if an administrative assistant with twenty-two years of service should lose protection from sex harassment under Title VII simply because she transferred to the Mayor's office.

ii.    **Ms. Mohr has been an employee of the City of Beech Grove for over eighteen years.**

The City of Beech Grove also argues that it should evade Title VII liability for Ms. Mohr's claim because the City of Beech Grove is not Ms. Mohr's employer. [*See* Filing 67 at 19.] This argument is both not supported by the facts and contrary to the Seventh Circuit's recent decision evaluating such an argument. In *Wells v. Winnebago County*, the Seventh Circuit held that the district court erred in holding that the county was not plaintiff's employer and provided an extensive explanation regarding the entity responsible for complying with federal employment

26

discrimination statutes, such as Title VII. *Wells v. Winnebago Cty., Ill.,* 820 F.3d 864, 865–66 (7th Cir. 2016). In *Wells*, the County hired and paid the plaintiff, the County was identified on tax forms as her employer, and the County had responsibility to control her working conditions. *Id.*

In determining that the County was plaintiff's employer and responsible for complying with federal employment discrimination statutes, Judge Easterbrook explained, "If the district court's approach were right, then organizations would be able to avoid their responsibilities by dividing authority among bureaus, divisions, or agencies…The federal laws concerning employment discrimination cannot be so easily evaded." *Id.* at 866.  As the Seventh Circuit explained in *Dunn v. Washington County Hospital,* 429 F.3d 689 (7th Cir. 2005), "Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer. Ability to "control" the actor plays no role." *Id.* at 691.

Like the plaintiff in *Wells*, Ms. Mohr was hired and paid by the City of Beech Grove, the City of Beech Grove was identified on her tax forms as her employer, and the City of Beech Grove has responsibility for controlling her working conditions. Ms. Mohr has worked for the City of Beech Grove in the Sewage Works Department for over eighteen years. As a Beech Grove employee, Ms. Mohr is subject to the Beech Grove employee manual and all policies and procedures regarding City employees. The City of Beech Grove cannot evade Title VII liability and claim it was not responsible for promoting a harassment-free workplace simply because Ms. Mohr worked in the Sewage Works Department, which is housed in the same side of the building as the Clerk Treasurer's office. A reasonable jury could conclude that the City of Beech Grove, who has been Ms. Mohr's employer for over eighteen years, was Ms. Mohr's employer under Title VII and should have promoted a harassment-free workplace.

### iii. Ms. Mohr is not an appointee on the policy-making level as a clerk in the Sewage Works Department who inputs information into the City's sewer billing system.

The Seventh Circuit case law regarding the interpretation of an appointee on the policymaking level is well established. *See Opp v. Office of State's Attorney of Cook County*, 630 F.3d 616 (7th Cir. 2010). "An individual is considered an appointee on the policymaking level if "the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." *Id.* at 619. "[D]etermining the powers inherent in a given office may be done without the aid of a finder of fact 'when the duties and responsibilities of a particular position are clearly defined by law and regulations.'" *Strong v. Delaware County*, 976 F. Supp. 3d 1038, 1046 (S.D. Ind. 2013)(quoting *Opp*, 630 F.3d at 621)).

Ms. Mohr was not appointed by elected officials, nor does her position as a clerk in the Sewage Works Department involve any policy-making.  Mr. McMillan did not appoint Ms. Mohr. When Mr. McMillan became the Clerk-Treasurer in January 2012, Ms. Mohr had already worked in the Sewage Works Department for thirteen years. Further, Ms. Mohr's position does not involve any meaningful input into governmental decision-making. The majority of Ms. Mohr's work is data entry. Ms. Mohr is responsible for entering the sewer bills payments, waiting on customers, balancing the drawer, answering phone calls, and working on liens. None of these tasks require meaningful input into governmental decision-making. The City of Beech Grove should not be exempt from providing Ms. Mohr a harassment-free workplace on the basis that she is somehow a policymaker. A reasonable jury could evaluate Ms. Mohr's position and determine that Title VII protects her from harassment on the basis of sex.

### 6. Both Plaintiffs filed timely charges of discrimination alleging continuing violations.

Both Defendants argue that Plaintiffs' claims are barred in part by the statute of limitations. Plaintiffs filed their EEOC charges on July 24, 2014, after the City failed to act to prevent Mr. McMillan's harassment even though the Internal Investigation revealed a pattern of harassment of women. The initial Internal Investigation report was released on June 6, 2014, and as the minutes from the July 7, 2014 City Council meeting reveal that the City turned a blind eye to the results of the investigation – merely offering to provide a copy to any person who requested a copy. Less than a month later Plaintiffs filed their EEOC charges and checked the "continuing violation" box because Mr. McMillan's harassment continued to occur.

The City of Beech Grove suggests that the Court ignore relevant evidence that preceded the 300-day window before Plaintiffs' EEOC charges. This argument is a misunderstanding of the continuing violations doctrine and has already been rejected by the Seventh Circuit. In *King v. Acosta Sales & Mktg., Inc.*, the Seventh Circuit held that the district court erred in failing to allow the plaintiff to allege all acts comprising the hostile work environment because the hostile work environment extended into the 300-day filing period. *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 472 (7th Cir. 2012). The Seventh Circuit explained that the district court's approach misapplied *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), which held that an employee may rest a hostile work environment claim on acts any time during his or her employment. *Id. Morgan* concluded that when an asserted unlawful employment practice occurs as a pattern over time rather than in one discrete act, it does not matter when the individual deed contributed to the pattern occurring, if the pattern continued into the 300 days before the charge's filing. *Id.* Plaintiffs have filed timely charges of discrimination alleging continuing violations of harassment on the basis of sex, and now this Court should allow a jury to decide the genuine issues of material fact presented in their case.

**B.    This Court should deny Defendants' motions for summary judgment because Plaintiffs have produced sufficient evidence from which a reasonable jury could infer sex harassment in violation of Section 1983.**

This Court should allow a jury to hear the evidence and evaluate Plaintiffs' claims under Section 1983 because Plaintiffs have produced sufficient evidence from which the jury could find Defendants violated their right to equal protection under the law.

**1.    Plaintiffs have produced sufficient evidence from which a reasonable jury could infer that Defendant Dan McMillan violated a clearly established constitutional right.**

Defendant Dan McMillan argues that he is not liable under Section 1983 because he should be entitled to qualified immunity. The defense of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In evaluating whether a state actor is entitled to summary judgment for qualified immunity, the Seventh Circuit considers: (1) whether the facts, taken in the light most favorable to the plaintiff show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *See Locke v. Haessig*, 788 F.3d 662, 666-67 (7th Cir 2015). Plaintiffs have provided sufficient evidence that Defendant Dan McMillan violated a constitutional right that was clearly established at the time of the violation.

**a.    Plaintiffs have produced sufficient evidence from which a reasonable jury could infer purposeful harassment on the basis of sex.**

The core of any equal protection case is a showing of intentional discrimination. *See Bohen v. City of East Chicago*, 799 F.2d 1180 (7th Cir. 1986). The Seventh Circuit has articulated two broad outlines for a claim of sexual harassment under the equal protection clause. *Id.* at 1187.

"First, the ultimate inquiry is whether the sexual harassment constitutes intentional discrimination." *Id.* "Second, a plaintiff can make an ultimate showing of sex discrimination either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination." *Id.* To make this showing, it is not necessary to show that all women employees are sexually harassed. *Id.* Harassment of the plaintiff alone because of her sex is enough. *Id.*

Plaintiffs have produced both types of evidence contemplated by the Seventh Circuit in *Bohen*. First, Plaintiffs have produced evidence that Mr. McMillan intentionally harassed women on the basis of sex. Ms. Mohr and Ms. Lockwood have produced evidence that Joann Brewington, Heather Brown, Brenda Michael, Janet Moore, and Sherry Morgan, also suffered from Mr. McMillan's harassment. This pattern or practice is strong evidence that Ms. Mohr and Ms. Lockwood have been the victims of discrimination on the basis of sex. Second, Plaintiffs have produced evidence of the conscious failure of Defendants to protect Ms. Mohr and Ms. Lockwood from abusive conditions. The City did nothing after receiving the results of the Internal Investigation that revealed a consistent theme of harassment on the basis of sex. Based on all of this evidence, a reasonable jury could infer purposeful harassment on the basis of sex in violation of the equal protection clause.

> **b.      It is well established that harassment on the basis of sex by a state actor under color of law violates the Equal Protection Clause and is actionable under Section 1983.**

It is well established that harassment on the basis of sex constitutes actionable sex discrimination under the equal protection clause to the United States Constitution. *See Bohen v. City of East Chicago*, 799 F.2d 1180, 1185-86 (7th Cir. 1986). In *Bohen*, the Seventh Circuit

explained that based on previous district court cases, it had assumed that sex harassment is actionable under the equal protection clause, but had not officially decided the issue. In *Bohen*, the Seventh Circuit held that sex harassment by a state employer constitutes sex discrimination in violation of the equal protection clause and is actionable under § 1983. Therefore, since at least 1986, it has been well established that harassment on the basis of sex by a state action under color of law violates the Equal Protection Clause and is actionable under Section 1983.

> **2.    Plaintiffs have produced sufficient evidence from which a reasonable jury could infer that Defendants violated Section 1983 under the second and third prongs of the *Monell* theories of liability.**

Section 1983 imposes liability on "person[s]" who violated plaintiffs' constitutional rights. *See* 42 U.S.C. § 1983.  In *Monell v. Department of Social Services*, the U.S. Supreme Court defined municipalities as "persons" under Section 1983. *See Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). The Seventh Circuit has interpreted *Monell* to mean, that in order to establish a Section 1983 claim, the plaintiff must produce evidence of (1) an express policy that, when enforced, causes a constitutional deprivation, (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy authority. *See e.g. Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007). Plaintiffs pled the second and third prongs of the *Monell* theories of liability in their Amended Complaint, and have produced sufficient evidence from which a reasonable jury could infer that Defendants violated Section 1983 under the second and third prongs of the *Monell* theories of liability. [*See* Plaintiffs Amended Complaint, Filing No. 35 at 5-6, ¶¶ 40-45.]

       **a.**    **Plaintiffs have produced sufficient evidence of a widespread practice that is so permanent and well settled as to constitute a custom or usage with the final force of law.**

Plaintiffs have produced sufficient evidence from which a reasonable jury could find that Defendants' harassment of female employees is a widespread practice that is so well settled as to constitute a custom or usage with the final force of law. The June 6, 2014 Internal Investigation revealed a consistent theme of complaints concerning McMillan's conduct toward women. Mr. McMillan has subjected women to belittling, yelling, and intimidation. Since Mr. McMillan took office, at least seven women have quit employment with the City of Beech Grove because of Mr. McMillan's hostile attitude toward women in the workplace. Further, the City of Beech Grove has turned a blind eye to this issue by failing to even conduct training on the issue of sex harassment or ensure that effective policies are in place to remedy this constitutional violation. In light of all of this evidence, a reasonable jury could find that Defendants have violated Ms. Mohr and Ms. Lockwood's rights under the equal protection clause.

       **b.**    **Plaintiffs have produced sufficient evidence from which a reasonable jury could infer that the constitutional injury was caused by a person with final policymaking authority.**

Plaintiffs have produced sufficient evidence from which a reasonable jury could conclude that a "person" with final policymaking authority caused the constitutional injury. First, Plaintiffs have produced evidence that Mr. McMillan, himself, testified that he has policymaking authority. The specific duties for the position of Clerk Treasurer are outlined under Indiana Law. *See* Ind. Code § 36-4-10-4 through  § 36-4-10-7. The Clerk Treasurer has final policy over several matters, including setting fiscal policy and the proposed city tax rate. *Id.* Second, Plaintiffs have produced evidence that the City of Beech Grove as a municipality has final policymaking authority over workplace policies and procedures, such as anti-harassment policies, reporting mechanisms, and

training in employment discrimination laws. Plaintiffs have produced sufficient evidence from which a reasonable jury could infer that both the City of Beech Grove and Dan McMillan violated the equal protection clause by failing to prevent harassment on the basis of sex in the workplace.

## VI.    CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' motions for summary judgment and allow a jury to decide the genuine issues of material fact presented in this case.

Respectfully submitted,

    s/Quincy E. Sauer
Quincy E. Sauer, Attorney No. 27320-49
Attorneys for Plaintiffs

MACEY SWANSON AND ALLMAN
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana  46204-1800
Telephone: (317) 637-2345
Facsimile: (317) 637-2369
Email: qsauer@maceylaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 18, 2016 a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system:

Matthew L. Hinkle
Cory C. Voight
COOTS, HENKE & WHEELER, P.C.
mhinkle@chwlaw.com
cvoight@chwlaw.com

Rosemary L. Borek
James S. Stephenson
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com
jstephenson@stephlaw.com

    s/Quincy E. Sauer
Quincy E. Sauer
Attorney for Plaintiffs

MACEY SWANSON AND ALLMAN
445 North Pennsylvania Street
Suite 401
Indianapolis, Indiana  46204-1800
Telephone: (317) 637-2345
Facsimile: (317) 637-2369
Email: qsauer@maceylaw.com