UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JULIE LOCKWOOD, | ) | |
| LINDA MOHR, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 1:15-cv-01348-JMS-MPB |
| vs. | ) | |
| | ) | |
| DAN MCMILLAN in his individual capacity | ) | |
| and in his official capacity as Clerk Treasurer, | ) | |
| CITY OF BEECH GROVE, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Plaintiff Linda Mohr is the wastewater clerk in the office of the clerk-treasurer of the City of Beech Grove ("the City"). Plaintiff Julie Lockwood is the administrative assistant to the Mayor of Beech Grove, Dennis Buckley ("Mayor Buckley"). Defendant Dan McMillan was elected clerk-treasurer of Beech Grove in 2011 and took office in January 2012. The Plaintiffs allege that shortly after taking office, Mr. McMillan began harassing the Plaintiffs and other female employees based on their gender. The Plaintiffs have raised claims asserting that the City violated 42 U.S.C. § 2000e ("Title VII"), and that both the City and Mr. McMillan violated 42 U.S.C. § 1983 and the Equal Protection Clause of the United States Constitution by subjecting them to a hostile work environment, thereby discriminating against them based on their gender.

Presently pending before the Court are: (1) Motions for Summary Judgment filed by the City, [Filing No. 63], and Mr. McMillan, [Filing No. 68]; and (2) Mr. McMillan's objections to the admission of certain evidence, [Filing No. 96]. For the reasons that follow, the Defendants' Motions for Summary Judgment are granted, and the objections to the admission of certain evidence are overruled in part and sustained in part.

1

# I.
## OBJECTIONS TO ADMISSIBILITY OF CERTAIN EVIDENCE AND STATEMENTS

Mr. McMillan objects to the admissibility of several pieces of evidence: (1) the resignation letters submitted by Brenda Michael and Janet Moore; (2) the Ogletree Report; and (3) certain statements contained within the Plaintiffs' statement of facts.

The Court emphasizes that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). The evidence to which the parties cite must be admissible. Fed. R. C. P. 56(c)(2).

### A. Resignation Letters

In support of their brief in opposition to the Defendants' Motions for Summary Judgment, the Plaintiffs submitted two exhibits at issue here: the resignation letters of Brenda Michael and Janet Moore, who are both former employees of the clerk-treasurer. [Filing No. 85-15; Filing No. 85-16.] Mr. McMillan objects to the admissibility of these letters, contending that they constitute hearsay and are not subject to an applicable exception. The Plaintiffs respond that the statements are admissible under Federal Rule of Evidence 803(6), the "business records" exception to the hearsay rule.

The resignation letters are both in email form. [Filing No. 85-15; Filing No. 85-16.] Ms. Michael's letter is addressed solely to Mr. McMillan, and Ms. Moore's letter is addressed to Mr. McMillan, his assistant Debbie Springer, Mr. Wiley, Mr. Bell, and Mayor Buckley. [Filing No. 85-15; Filing No. 85-16.] Mr. McMillan stated in his deposition that he kept his own separate personnel files on the employees who worked in his office. [Filing No. 85-6 at 7.] He testified that those records were kept in a locked file cabinet, which only he and Ms. Springer had access to. [Filing No. 85-6 at 7.] The deposition testimony is not entirely clear, but it appears that Mr.

McMillan wrote responses to resigning employees' resignation letters, which he placed into their personnel files.  [Filing No. 85-6 at 16.]

The Plaintiffs appear to acknowledge that the resignation letters constitute hearsay, in that they are out-of-court statements that are being introduced to prove the truth of the matters they assert.  [Filing No. 99 at 3.]  Rule 803 creates exceptions to the hearsay rule, including Rule 803(6), which allows for the admission of:

> [a] record of an act, event, condition, opinion, or diagnosis if:
>   (A)  the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>   (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>   (C) making the record was a regular practice of that activity;
>   (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>   (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

In analyzing whether the letters fall within the 803(6) exception, the Court first finds that the letters were drafted by the employees based on their own personal knowledge.  Mr. McMillan's deposition testimony supports the conclusion that records regarding personnel matters were kept in the course of his regularly conducted business activities, and that he was the custodian of those records.  [Filing No. 85-6 at 16]; *see also Corral v. Chicago Faucet Co.*, 2000 WL 628981, at *3 (N.D. Ill. 2000) (concluding "the memo appears to have been produced by Chicago Faucet from Jolley's personnel file, which is enough for present purposes to authenticate the memo and perhaps enough to overcome a hearsay objection via either Fed.R.Evid. 803(6), as the memo is likely a business record of Chicago Faucet.").  While the admission of a business record normally requires an affidavit "sworn to by a person who would be qualified to introduce the record as evidence at

trial," Mr. McMillan's sworn deposition testimony is sufficient for that purpose.  *See Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).  Finally, Mr. McMillan does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.  Mr. McMillan simply asserts that "there is no exception to the hearsay rule to allow for these statements."  [Filing No. 96 at 3.]  The Court concludes that, at this stage, the Plaintiffs have provided a sufficient showing of admissibility for the Court to consider Ms. Michael's and Ms. Moore's letters of resignation for purposes of summary judgment.

Mr. McMillan's objection to the Court's consideration of this evidence is **OVERRULED**.

**B. The Ogletree Report**

Mr. McMillan also objects to the Court's consideration of the Ogletree Report submitted by the Plaintiffs.[1]  [Filing No. 96 at 3-5.]  The Report was drafted by the Ogletree Deakins law firm, and was created based upon interviews conducted with a hand-picked selection of current and former City and clerk-treasurer employees.  The interviews were conducted both in person and by telephone.  The drafters also reviewed "some email communications between [Mr.] McMillan and others relating to employee resignations and [Mr.] McMillan's conduct towards current and former Beech Grove Employees."  [Filing No. 85-18 at 2.]  Approximately six of the Report's nine pages summarize the interviews conducted, and the final three pages describe options for addressing Mr. McMillan's (and his assistant's) behavior.  [Filing No. 85-18.]

Mr. McMillan argues that the methodology used to create the Report is not sufficiently reliable for its admission under the "public records" exception to the rule against hearsay.  [Filing No. 96 at 4]; *see also* Fed. R .Evid. 803(8)(iii).  In addition, Mr. McMillan contends that the

_____

[1] Mr. McMillan does not distinguish between the full nine-page Ogletree Report and the shorter, later-released Summary Report.  The Court treats Mr. McMillan's objection as applying to both.

4

Plaintiffs have not shown that the Report was created pursuant to a legally authorized investigation, as required by the rule.  [Filing No. 96 at 4]; *see also* Fed. R. Evid. 803(8)(A)(iii).  And finally, Mr. McMillan argues that even if portions of the Report were admissible, the report's conclusions and opinions would not be admissible.  [Filing No. 96 at 4.]  The Plaintiffs respond that the language "legally authorized investigation" refers only to criminal cases.  [Filing No. 99 at 3.] They also argue that Mr. McMillan has not shown that the Report lacks sufficient indicia of trustworthiness.  [Filing No. 99 at 3.]

Federal Rule of Evidence 803 enumerates several exceptions to the prohibition against hearsay, directing that statements falling within the exceptions are "not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness."  Fed. R. Evid. 803. Subsection (8) provides that the record or statement of a public office is not excluded by the rule, if "it sets out...in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation," Fed. R. Evid. 803(8)(A)(iii), and if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B).  The proponent of the evidence bears the burden of establishing that it meets the Rule's requirements for admissibility.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing *Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987) (holding that the proponent of hearsay evidence must prove to the court, by a preponderance of the evidence, that the Rules of Evidence have been satisfied)).

As for the requirements of subsection (A)(iii), the Plaintiffs first argue that the "legally authorized investigation" language applies only in criminal cases.  The Court disagrees.  The provision states that a report will be admissible if "it sets out...in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation."  Nothing

in that language suggests that that the phrase "legally authorized investigation" applies only to criminal cases, and the syntax of the sentence itself makes clear that the phrase applies to the entire preceding clause.  Second, courts have routinely applied the "legally authorized investigation" requirement to civil matters.  *See, e.g., Jordan v. Binns,* 712 F.3d 1123, 1132 (7th Cir. 2013); *Mathin v. Kerry*, 782 F.3d 804, 809 (7th Cir. 2015).

Mr. McMillan argues that the Ogletree Report was not "legally authorized" and is therefore inadmissible.  [Filing No. 96 at 4.]  Neither party provides legal citation or authority for the proper interpretation of the term "legally authorized".  First, it is not clear from the Plaintiffs' briefing and factual allegations who commissioned the report.  Mr. Bell, the President *Pro Tempore* of the City Council, signed the engagement letter with Ogletree Deakins.  [Filing No. 85-17 at 3.]  The engagement letter is addressed to Mr. Bell and Mr. Wiley, and the subject line of the engagement letter reads "Representation of the City Council/City of Beech Grove."  [Filing No. 85-17 at 1.] The letter does not specify who the client of the engagement is, but the scope is described as follows: "[y]ou asked us to represent you in connection with the investigation into allegations against Dan McMillan."  [Filing No. 85-17 at 1.]  The Report states that "the City of Beech Grove and the Town Council for the City of Beech Grove" retained the firm.  [Filing No. 85-18 at 1.]

Mr. McMillan contends that the Beech Grove City Council was required to vote to approve the investigation in order for it to be "legally authorized" under the rule.  [Filing No. 96 at 4.] Indiana Code Section 36-4-6-21 outlines the investigative powers of a legislative body.  As relevant here, under that statute:

(a) The legislative body may investigate:
   (1) the departments, officers, and employees of the city;
   (2) any charges against a department, officer, or employee of the city…

Ind. Code § 36-4-6-21.  Nothing in that provision expressly requires a vote by the legislative body in order to conduct an investigation, and neither party has cited any legal authority as to whether a vote authorizing the report would be required.

The Court concludes that, given the factual uncertainty concerning the origin of the Report, as well as the legal questions concerning the requirement for "legal authorization," the Plaintiffs have not met their burden to establish that the Report meets the "legally authorized" requirement of Fed. R. Evid. 803(8)(A)(iii).

Moreover, the Court also concludes that the circumstances of the Report indicate a lack of trustworthiness under subsection (B).  *See* Fed. R. Evid. 803(8)(B).  Mr. McMillan argues that there is no authenticating affidavit from the attorney who conducted the investigation describing the methodology employed.  He also points out that several key witnesses were not interviewed, including himself and three of the four women who worked for him at the time.

The notes to Rule 803 suggest that the following non-exhaustive factors "may be of assistance" in determining whether an investigative report is sufficiently trustworthy to be excluded from prohibition against hearsay: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which it was conducted; (4) possible motivation problems suggested.  Fed. R. Evid. 803, 1972 Advisory Committee Notes; *see also Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 167 (1988).

While the facts presented by the Plaintiffs are fairly vague regarding timing, the investigation does not appear to have been particularly timely.  Plaintiffs allege that Mr. McMillan's harassment of women began as soon as he took office, in January of 2012.  [Filing No. 35 at 2.]  Ms. Mohr and Ms. Lockwood allege that they complained to Mr. Bell and Mayor Buckley at some point in 2013 about Mr. McMillan's treatment of women.  [Filing No. 85-4 at

20.]  The engagement letter with Ogletree Deakins was signed on April 25, 2014, and the Report was transmitted to the Mayor, Mr. Bell, and Mr. Wiley on June 6, 2014.  [Filing No. 85-17; Filing No. 85-18.]  Depending on when Ms. Mohr and Ms. Lockwood spoke with Mr. Bell, a number of months (and possibly a year or longer) passed before the investigation was initiated.

The parties have not presented any information regarding the special skill or experience of the investigator, beyond the fact that the investigator was a lawyer.  And, as detailed above, the circumstances of the engagement of Ogletree Deakins are not clear from the facts provided, including the specific identity of the client.  No hearing was conducted.  The investigator did not interview Mr. McMillan, the subject of the investigation.  [Filing No. 85-6 at 19.]  Mr. McMillan testified that the investigator never attempted to interview him, [Filing No. 85-6 at 19], but the Summary Report indicates that the interviewer requested an interview with Mr. McMillan, [Filing No. 85-19 at 1].  The Summary Report indicates that Mr. McMillan never responded to the request, but that his attorney contacted Mr. Wiley (the City Attorney) regarding the request.  [Filing No. 85-19 at 1.]  The interviewer also did not interview three women who worked for Mr. McMillan at the time of the report.  [Filing No. 85-6 at 17-19.]  The Court also notes that Mr. McMillan does not appear to have been present for any of the interviews which formed the underlying basis of the Report.

During his deposition, Mr. McMillan testified as to his belief that the Report was politically motivated and was designed to hurt his chances at reelection.  [Filing No. 85-6 at 17.]  The Report itself indicates that the investigator conducted in-person and telephone interviews with a hand-picked selection of current and former City employees, and reviewed "some" email communications between Mr. McMillan and others.  [Filing No. 85-18.]  But no other information is provided regarding the methodology employed by the investigator, what questions were asked,

and how those responses were analyzed. Finally, the Court also notes that the investigation was conducted by a third party and not the investigative body or one of its members. Given these facts, the Court concludes that the Report lacks the indicia of reliability that would render it admissible under Rule 803(8).

Finally, the Court notes that even if the Report were "legally authorized" and sufficiently trustworthy, the Report appears be comprised largely of statements that would still be inadmissible under Rule 802, the Rule against Hearsay. *See* Fed. R. Evid. 802. Many, if not most, of the statements in the Report are either not factual findings or they are statements that constitute hearsay within hearsay that are not subject to an applicable exception. Fed. R. Evid. 803(8)(A)(iii).

The Committee Notes to the Rule indicate that "[t]he Committee intends that the phrase "factual findings" be strictly construed and that evaluations or opinions contained in public reports shall not be admissible under this Rule." Fed. R. Evid. 803, 1974 Advisory Committee Notes. In *Beech Aircraft v. Rainey,* the Supreme Court clarified that "portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report." 488 U.S. 153, 170 (1988). The Court reasoned that:

> it is not apparent that the term 'factual findings' should be read to mean simply 'facts' (as opposed to 'opinions' or 'conclusions'). A common definition of 'finding of fact' is, for example, '[a] conclusion by way of reasonable inference from the evidence.' Black's Law Dictionary 569 (5th ed. 1979). To say the least, the language of the Rule does not compel us to reject the interpretation that 'factual findings' includes conclusions or opinions that flow from a factual investigation. Second, we note that, contrary to what is often assumed, the language of the Rule does not state that 'factual findings' are admissible, but that '*reports* ... setting forth ... factual findings' (emphasis added) are admissible. On this reading, the language of the Rule does not create a distinction between 'fact' and 'opinion' contained in such reports.

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 163-64 (1988).

So while opinions and conclusions based on factual investigation are permitted by the Rule, evidence contained within the Report is only "admissible to the extent that the maker of the document could testify to that evidence were he present in court." *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 839 (N.D. Ill. 2005) (concluding that EEOC investigator's notes did not fall within the exception (citing *Denny v. Hutchinson Sales Corp.*, 649 F.2d 816, 821 (10th Cir. 1981)). This means that hearsay statements contained within the Report (which would otherwise constitute hearsay within hearsay) are not rendered admissible by the fact that they are contained within the Report. *See Stolarczyk*, 376 F. Supp. 2d at 839 (citing *Lewis v. Velez*, 149 F.R.D. 474, 487 (S.D.N.Y. 1993) (noting that "Rule 803(8) does not circumvent the hearsay rule" and noting that "[t]his principle excludes much of the Bryan Report [concerning a prison incident], which is comprised largely of hearsay statements from correction officers involved in the ... incident.")).

The bulk of the Ogletree Report--pages two through six, at least—is comprised of summaries of the interviews conducted with former and current City and clerk-treasurer employees. Those summaries recount what the individuals told the interviewer/investigator. First, these are hearsay statements, which do not appear to be subject to an applicable hearsay exception. And second, the summaries do not, for example, contain the interviewer's factual findings as to whether or not the statements were true, or whether the events described actually occurred. For these reasons, the Court concludes that even if the Report satisfied that "legal authorization" and "trustworthiness" requirements of the Rule, the Plaintiffs have not established that the Report contains "factual findings," as contemplated by the Rule.

For these reasons, Mr. McMillan's objection to the admission of the Ogletree Report is **SUSTAINED**. The Court notes, however, that the City has not objected to admission of the

Report, so the Court may consider the Report as it pertains to the City. The Court may also consider the Report when offered for purposes other than the truth of the matter asserted, as the Report would not then constitute hearsay.

### C. Plaintiffs' Statements

Mr. McMillan also objects to ten statements contained within the Plaintiffs' statement of facts, on the basis of the general objections that they are conclusions that are unsupported by reference to admissible evidence or constitute inadmissible speculation as to the state of mind of the parties involved. [Filing No. 96 at 5-6.]

The Court reemphasizes that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). The evidence to which the parties cite must be admissible. Fed. R. C. P. 56(c)(2). While an individual may put forward evidence in the form of declarations, testimony, or affidavits, he or she "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. While personal knowledge may include reasonable inferences, "those inferences must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). As the Seventh Circuit has cautioned:

> …in many employment discrimination cases…the plaintiff unsuccessfully attempts to thwart summary judgment *by speculating as to the defendant/employer's state of mind*. See *Filippo*, 141 F.3d at 750 (employee's speculation that union retaliated against her for running for local union president not sufficient to create genuine issue of material fact to defeat summary judgment motion); *Cowan*, 123 F.3d at 444 (perpetually tardy employee could not defeat motion for summary judgment with mere inference that termination was due to racial animus rather than record of tardiness).

*Id.* at 772 (emphasis added).

Mr. McMillan objects to the following several statements on the basis that they constitute speculation as to the state of mind of individuals for whom the Plaintiffs have not submitted admissible evidence such as depositions, declarations, or affidavits:

- Objection 1: "These women have left, all quit, because of the way Mr. McMillan treats women, the way he talks to women." [Filing No. 96 at 5 (citing Filing No. 86 at 6).] In support of this statement, Plaintiffs cite to the deposition testimony of Ms. Mohr. [Filing No. 85-4 at 17.]

- Objection 2: "Ms. Mohr believes Mr. McMillan intimidates her and others because she is a woman and he knows he can." [Filing No. 96 at 5 (citing Filing No. 86 at 6).] The Plaintiffs cite to Ms. Mohr's deposition testimony to support this statement. [Filing No. 85-4 at 17.]

- Objection 5: "Ms. Lockwood further testified that Mr. McMillan does not like women and gets irate and very hateful when a woman asks a question." [Filing No. 96 at 5 (citing Filing No. 86 at 7).] The Plaintiffs cite to Ms. Lockwood's deposition testimony to support this statement. [Filing No. 85-2 at 5.]

- Objection 6: "Ms. Lockwood said, 'Dan is very intimidating to women and I think the women are afraid of him.'" [Filing No. 96 at 6 (citing Filing No. 86 at 7).] The Plaintiffs cite to Ms. Lockwood's deposition testimony to support this statement. [Filing No. 85-2 at 11.]

- Objection 8: "Ms. Mohr believed this because of the way Mr. McMillan treated her, plus the pattern of all the other women he had treated that way." [Filing No. 96 at 6

(citing Filing No. 86 at 9).]  The Plaintiffs cite to Ms. Mohr's deposition testimony to support this statement.  [Filing No. 85-4 at 22.]

- Objection 9: "He treated women poorly…Brenda had said things, Joann had said things.  Janet, had said things…I know he treated her horrible, horrible."  [Filing No. 96 at 6 (citing Filing No. 86 at 9).]  The Plaintiffs cite to Ms. Lockwood's deposition testimony to support this statement.  [Filing No. 85-2 at 14.]

The Court begins by noting that several of these "factual allegations" are phrased as simply recounting what Ms. Mohr and Ms. Lockwood said in their depositions.  However, the fact of what either plaintiff said in her deposition is irrelevant, so the Court assumes that the statements are cited for the introduction of the information contained within them.

These factual allegations all suffer from the same evidentiary infirmity, which is that they are based purely on the speculation of the Plaintiffs as to the mental state or motivations of the parties involved—*i.e.*, why female employees quit (Objections 1 and 8), why Mr. McMillan behaved negatively toward the Plaintiffs or other individuals (Objections 2, 5, and 6), and whether Mr. McMillan's behavior was based on the subjects' gender (Objections 1, 2, and 9).  In the case of each statement, the cited deposition testimony merely states the plaintiff's belief as to the motivation or state of mind of the subject(s), and this does not constitute admissible evidence.  These are precisely the types of speculative statements referenced in *Payne*, which the Seventh Circuit held will not suffice to thwart summary judgment.  *Payne*, 337 F.3d at 772.  Moreover, the statements do not meet the personal knowledge requirement of Rule 602.  *See* Fed. R. Evid. 602.  The Court therefore **SUSTAINS** Mr. McMillan's objections to these statements.[2]

---

[2] The Court notes that several of the stricken statements reference the Plaintiffs' allegations that many female employees resigned from the clerk-treasurer's office due to Mr. McMillan's alleged poor treatment of women.  The Plaintiffs appear to have had ample opportunity to secure affidavits

Mr. McMillan also raises the following two objections on the basis that the statements are based on speculation as to the state of mind of the subjects:

- Objection 7: "Ms. Michaels left because she was treated so poorly by Mr. McMillan." [Filing No. 96 at 6 (citing Filing No. 86 at 8).]  The Plaintiffs submitted Ms. Michael's resignation letter in support of this allegation.  The letter states "I no longer [sic] comfortable working in the type of environment where asking for advice or direction often leads to discourteous and threatening emails.  Unfortunately, the unclear procedures and expectations have led to unfair and unnecessary reprimands.  This along with unequal treatment of employees is what has made my resignation necessary."  [Filing No. 85-15.]

- Objection 10: "Ms. Moore left because she was treated so badly by Mr. McMillan." [Filing No. 96 at 6 (citing Filing No. 86 at 10).]  As with Ms. Michael, the Plaintiffs submitted Ms. Moore's resignation letter in support of this allegation.  [Filing No. 85-16.]  The letter's first sentence reads "[j]ust wanted to let you both know I will no longer subject myself to your bullying and unprofessional behavior."  [Filing No. 85-16.]

As the Court previously concluded, these resignation letters are admissible under the "business records" hearsay exception of Federal Rule of Evidence 803(6).  The letters provide direct factual support for the cited allegations, and therefore Mr. McMillan's objection is **OVERRULED**.

_____

or declarations from those individuals attesting to the circumstances of and reasons for their resignations.  They should have done so, since without those, their allegations lack evidentiary support.

14

Mr. McMillan also objects to the following statement (Objection 3): "Joann Brewington had to take Ed Bell in the office with her to resign because she was so afraid of Mr. McMillan." [Filing No. 96 at 5 (citing Filing No. 86 at 6).]  This statement is taken directly from Ms. Lockwood's deposition testimony.  [Filing No. 85-2 at 6.]  Later in the deposition, Ms. Lockwood states that Ms. Brewington told Ms. Lockwood that she was afraid of Mr. McMillan, and that this was the reason she asked Mr. Bell to accompany her while she resigned.  [Filing No. 85-2 at 11.]  The only objections Mr. McMillan raises to this statement are the general ones described above, including speculation on the subject's state of mind.  Ms. Lockwood testified that Ms. Brewington told Ms. Lockwood that she was afraid, so this statement is based on the personal knowledge of Ms. Lockwood.[3]  Mr. McMillan's objection is **OVERRULED**.

And finally Mr. McMillan objects to this statement (Objection 4): "Ms. Lockwood's notes detail over forty-five incidents of harassment."  [Filing No. 96 at 5 (citing Filing No. 86 at 7).]

While this statement contains the conclusion that certain conduct constituted harassment, the Court construes that statement as limited to the allegation that Ms. Lockwood detailed forty-five incidents that she considers to have been harassing.  The Court does not construe it as stating that the conduct constituted prohibited harassment based on the Plaintiffs' sex. As so explained, Mr. McMillan's objection to this statement is **OVERRULED**.

## II.
### BACKGROUND

Many of the following facts are undisputed.  Where disputed, however, the Court presents the facts in the light most favorable to the non-moving parties, the Plaintiffs.  Ms. Lockwood began working for the City of Beech Grove in 1994 as a secretary at the Beech Grove Fire Department.

---

[3] Mr. McMillan does not raise a hearsay challenge, and the Court will not address a potential hearsay issue absent a specific objection.

[Filing No. 85-1 at 4.]  When her position was eliminated, she was hired by the clerk-treasurer's office in 2004.  [Filing No. 85-1 at 5.]  Ms. Lockwood worked in that position until January 2012, when Mayor Buckley hired her as his administrative assistant.  [Filing No. 85-1 at 6.]  Her duties include scheduling, preparing city council and board of works packages, typing ordinances, copying and scanning, and attending meetings at the Mayor's direction.  [Filing No. 85-1 at 9.]  Her duties require her to interact with the clerk-treasurer's office on payroll and other matters.  [Filing No. 85-1 at 9-10.]  Mr. McMillan does not supervise Ms. Lockwood or have the authority to fire her.  [Filing No. 85-6 at 22.]  Ms. Lockwood serves at the pleasure of Mayor Buckley.  [Filing No. 63-1 at 2.]

Ms. Mohr began working for the City of Beech Grove in 1998 as a clerk in the sewage works department of the clerk-treasurer's office.  [Filing No. 85-4 at 5.]  Her job duties include helping customers, answering the phone, collecting and managing billing, and filing liens.  [Filing No. 85-4 at 5.]  Ms. Mohr serves at the pleasure of Mr. McMillan.  [Filing No. 63-10 at 1.]

Mr. McMillan was elected clerk-treasurer of the City of Beech Grove in 2011 and took office in January 2012.  [Filing No. 85-6 at 3.]  The City Hall of Beech Grove is comprised of two separate buildings, 802 and 806 Main Street, which are connected by a hallway.  [Filing No. 85-4 at 7.]  One side of the building houses the office of the Mayor, where Ms. Lockwood works, and the other side houses the clerk-treasurer's office, where Ms. Mohr works.  [Filing No. 85-4 at 7.]  Ms. Lockwood performs a variety of duties that require her to visit the clerk-treasurer side of the building, including using the scanner, payroll functions, and delivering mail.  [Filing No. 85-1 at 9-10.]  Ms. Lockwood also uses the restroom on the clerk-treasurer side of the building, because using the restroom on the Mayor's side requires her to climb two flights of stairs.  [Filing No. 85-1 at 10.]

16

Ms. Lockwood testified that Mr. McMillan rebuffed her offers to help train clerk-treasurer staff, including that he informed at least one staff member not to talk to Ms. Lockwood. [Filing No. 85-1 at 8; Filing No. 85-4 at 20; Filing No. 85-5 at 4.] Mr. McMillan also informed Mayor Buckley via email that he did not want Ms. Lockwood to enter the clerk-treasurer side of the building. [Filing No. 85-1 at 8; Filing No. 85-4 at 20.] Mr. McMillan stated that Ms. Lockwood interrupted his employees and "undermin[ed] his staff." [Filing No. 85-1 at 8.] Mr. McMillan never told Ms. Lockwood directly that he did not want her on his side of the building. [Filing No. 85-1 at 8; Filing No. 85-1 at 13.] Ms. Lockwood remembers seeing an email from Mr. McMillan to Mayor Buckley stating that Ms. Lockwood should stay out of the clerk-treasurer side of the building "or else." [Filing No. 85-1 at 13.] Ms. Lockwood also testified that Mr. McMillan began locking the door between the two sides of the building prior to 8 a.m. and after 4 p.m., in order to keep Ms. Lockwood on the mayor's side. [Filing No. 85-1 at 11; Filing No. 85-4 at 20.]

Ms. Lockwood also stated that when she entered the clerk-treasurer side of the building to use the scanner or the restroom, Mr. McMillan would exit his office to watch her. [Filing No. 85-1 at 14.] While she used the scanner, he would often stand in the hallway "leaning against a cabinet or acting like he's looking through mail until I go back to my side and then he goes back to his office." [Filing No. 85-1 at 12.] Ms. Lockwood also testified that, "I think he harasses me when he stands outside the restroom when I go out there. … He stands there, acts like he's looking at the mail. He's never out there until I come in that way to go to the building." [Filing No. 85-1 at 14.] Ms. Lockwood also stated that Mr. McMillan would glare at her when she entered the clerk-treasurer side of the building. [Filing No. 85-1 at 14.]

In addition, Ms. Lockwood stated that, in a variety of ways, Mr. McMillan would attempt to bypass or avoid her when he interacted with Mayor Buckley. Ms. Lockwood stated that if Mr.

McMillan needed to speak with Mayor Buckley while the Mayor was in Ms. Lockwood's office,
Mr. McMillan would ask the Mayor to leave her office in order to speak. [Filing No. 85-1 at 22.]
Mr. McMillan would also bypass Ms. Lockwood while bringing guests to speak with the Mayor,
sometimes walking them into the Mayor's office while the Mayor was meeting with other people.
[Filing No. 85-1 at 14-15.]

Ms. Lockwood also testified about a series of separate incidents involving Mr. McMillan.
Ms. Mohr heard Mr. McMillan call Ms. Lockwood "a pain in the ass" during a phone conversation.
[Filing No. 85-1 at 13; Filing No. 85-4 at 20.] Ms. Lockwood stated that on one occasion, when
she greeted a visiting auditor on the clerk-treasurer side of the building, Mr. McMillan slammed
and locked the door separating the two sides. [Filing No. 85-1 at 15.] Ms. Lockwood was also
informed that, according to Mr. McMillan, Ms. Lockwood was not permitted to order office
supplies or handle emergency facility matters. [Filing No. 85-1 at 16-17.] She also recounted that
Mr. McMillan sent pension records to everyone involved in pension issues except her, despite the
fact that she was the pension secretary. [Filing No. 85-1 at 17.] Mr. McMillan also shredded a
poster regarding a farmer's market that Ms. Mohr posted on behalf of Ms. Lockwood, despite
allowing others to post flyers in the office. [Filing No. 85-1 at 17.] Mr. McMillan moved the
Mayor's mail slot and at one point locked office supplies in his office, where Ms. Lockwood could
not access them. [Filing No. 85-1 at 17.]

Ms. Lockwood also stated that when her daughter ordered her a bouquet from a national
flower delivery service, the order was fulfilled by Mr. McMillan's flower shop. [Filing No. 85-1
at 20.] Ms. Lockwood testified that the bouquet delivered by the shop was made to be intentionally
ugly, which was done "in retaliation." [Filing No. 85-1 at 20.] On one occasion, Mr. McMillan
glared at Ms. Lockwood in the kitchen, and this incident was witnessed and commented upon by

another individual.  [Filing No. 85-1 at 22.]  Ms. Lockwood also stated that on Facebook, one of Mr. McMillan's friends referred to Ms. Lockwood as "a piece of shit that crawls out of somebody's ass."  [Filing No. 85-1 at 14; Filing No. 85-2 at 2.]

And finally, Ms. Lockwood stated that several women resigned from the clerk-treasurer's office due to Mr. McMillan's treatment of them.  [Filing No. 85-2 at 6; Filing No. 85-15; Filing No. 85-16.]  She also stated that, "[i]f a department head comes into city hall, he will talk with them.  If … a man asked a question to him at city hall, he will talk with them."  [Filing No. 85-2 at 5.]  Ms. Lockwood testified that "if [Ms. Mohr] will try to reason with him doing the sewer work, now, she's been doing for as long as she has, 18-plus years.  He gets very defensive.  And he get angry.  He gets very angry and starts yelling."  [Filing No. 85-2 at 5.]  Ms. Lockwood testified generally that, "I think he intimidates me.  He tries to intimidate me. … He intimidates me period by just the way he acts towards me."  [Filing No. 85-1 at 14.]

Ms. Mohr also testified that Mr. McMillan intimidates her.  [Filing No. 85-4 at 17.]  Ms. Mohr stated that Mr. McMillan would yell at her in public while there were customers and other city employees present.  [Filing No. 85-4 at 17.]  She testified that Mr. McMillan would yell at and belittle other female employees as well.  [Filing No. 85-4 at 17-18.]  While engaged in an argument with Mr. McMillan, Ms. Mohr stated, "[y]ou lie."  [Filing No. 85-5 at 5]  Mr. McMillan responded that Ms. Mohr was "a bold-faced liar."  [Filing No. 85-4 at 17.]  Ms. Mohr also testified that at one point, Mr. McMillan would not look at her when they crossed paths in the hallway.  [Filing No. 85-4 at 17.]  He would turn his head and keep walking.  [Filing No. 85-4 at 17.]  Ms. Mohr stated generally that "[y]ou would never know, when he walked in the door, if he was going to be okay or if he was upset about something and would go off.  He could change like that

(indicating).  I mean, there's just multiple incidents where he would get upset."  [Filing No. 85-5 at 3.]

In 2013, Ms. Mohr and Ms. Lockwood reported the perceived harassment to Ed Bell, President *Pro Tempore* of the Beech Grove City Council.  [Filing No. 85-4 at 20.]  At some point prior to that, Ms. Mohr had also reported the alleged harassment to Mayor Buckley.  [Filing No. 85-4 at 20.]  In April 2014, an investigation of Mr. McMillan's actions was conducted by the law firm Ogletree, Deakins, Nash, Smoak & Stewart ("Ogletree Deakins").[4]  An investigative report (the "Ogletree Report") was delivered to Mayor Buckley, Mr. Bell, and City Attorney Craig Wiley on June 6, 2014.  [Filing No. 85-18.]  A summary version of that report was released on June 20, 2014.  [Filing No. 85-19.]  The City Council held an executive session, during which the Council discussed the report.  [Filing No. 85-1 at 21.]  Following the release of the Ogletree Report, the City Council passed an ordinance amending the City of Beech Grove Personnel Manual to address issues of employee sexual harassment.  [Filing No. 63-1 at 3; Filing No. 63-3.]

Ms. Lockwood and Ms. Mohr filed their Amended Complaint on December 9, 2015, and Defendants filed their Motions for Summary Judgment on August 17 and August 18, 2016.  [Filing No. 35; Filing No. 67; Filing No. 72.]

## II.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or

---

[4] Further detail on the investigation and resultant reports will be provided in Part II of this order.

affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-

finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

### III.
#### ANALYSIS

### A. Violation of Title VII by the City of Beech Grove

The Plaintiffs allege that the City of Beech Grove has violated Title VII by subjecting them to a hostile work environment on account of their sex.[5] [Filing No. 35 at 5.] The City moves for summary judgment on this claim on the following bases: (1) that Title VII protections do not extend to Ms. Lockwood and Ms. Mohr, because they are considered the personal staff of elected officials, and are therefore not "employees" as defined under that statute; (2) that Ms. Mohr is not an "employee" because she is an appointee at the policymaking level; (3) that the City is not Ms.

---

[5] In their Amended Complaint, the Plaintiffs also allege a "differential treatment" claim under Title VII. As their briefing in opposition to summary judgment contains no argument as to that theory of liability, the Court deems that claim to have been abandoned.

Mohr's employer under Title VII; and (4) that the Plaintiffs cannot establish that they suffered any sex-based discrimination for which the City could be liable.

### 1. Personal Staff Exception

As a threshold matter, the City argues that Ms. Lockwood and Ms. Mohr do not fall within the definition of "employees" under Title VII, and therefore are not subject to the Act's protections. [Filing No. 67 at 17-19; Filing No. 67 at 22-24.] The Plaintiffs respond that they have presented sufficient evidence for a jury to conclude that they are employees under Title VII, and that they should therefore survive summary judgment. [Filing No. 86 at 26-27.]

Title VII defines the term "employee," in relevant part, as follows:

> [t]he term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, *or any person chosen by such officer to be on such officer's personal staff,* or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.

42 U.S.C. § 2000e(f) (emphasis added). The statute does not define "personal staff," and the Seventh Circuit has not determined the meaning of the term. *See, e.g., Dintelmann v. Vill. of Freeburg, Ill.,* 2015 WL 5176418, at *2-3 (S.D. Ill. 2015).

Based on a standard originally announced by the Fifth Circuit, courts commonly apply a non-exhaustive, six-factor test to determine whether a plaintiff falls within the "personal staff" exception of Title VII. *See Teneyuca v. Bexar Cty.,* 767 F.2d 148 (5th Cir. 1985); *see also, Dintelmann,* 2015 WL 5176418, at *2-3; *Deneen v. City of Markham,* 1993 WL 181885, at *3 (N.D. Ill. 1993); *Leving v. City of Chicago,* 1988 WL 20046, at *2 (N.D. Ill. 1988). The factors include:

> (1) whether the elected official has plenary powers of appointment and removal, (2) whether the person in the position at issue is personally accountable to only that elected official, (3) whether the person in the position at issue represents the elected

23

official in the eyes of the public, (4) whether the elected official exercises a considerable amount of control over the position, (5) the level of the position within the organization's chain of command, and (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Teneyuca*, 767 F.2d at 151-52 (internal citations omitted).   Courts have also analyzed the legislative history of Title VII and concluded that Congress intended that its exemptions be construed narrowly.  *See Deneen,* 1993 WL 181885 at *2 (citing *Owens v. Rush,* 654 F.2d 1370, 1375 (10th Cir. 1981) (addressing personal staff exception)).

### a. Ms. Lockwood

The City argues that as the administrative assistant to Mayor Buckley, Ms. Lockwood is a member of the personal staff of an elected official.  [Filing No. 67 at 17-19.]  Ms. Lockwood responds by noting that she was originally hired by the City of Beech Grove, and then transferred to the Mayor's office.  [Filing No. 86 at 26.]

Regarding factors one and two, neither party has provided a job description for Ms. Lockwood.  However, an affidavit submitted by Mayor Buckley states that he has "complete discretion" to select his administrative assistant, who serves at his pleasure, and that he is the only person who has the authority to supervise and direct her.  [Filing No. 63-1 at 2.]  The Plaintiffs have not presented admissible evidence to dispute these factual assertions.  Therefore, it appears that Mayor Buckley has plenary powers of appointment and removal, and Ms. Lockwood is personally accountable only to Mayor Buckley.

As for the third factor, whether Ms. Lockwood represents Mayor Buckley in the eyes of the public, the City has submitted a copy of the City of Beech Grove's official website, which lists only Mayor Buckley and Ms. Lockwood as contact points.  [Filing No. 63-2 at 1.]  The City also contends that "[s]he represents him to the public because persons who want access to the mayor are supposed to go through her."  [Filing No. 67 at 19.]  The Plaintiffs do not offer a response to

24

the City's contention.  The Court is not convinced, however, that the City's proffered evidence establishes that Ms. Lockwood represented Mayor Buckley in the eyes of the public.  The City has not shown that Ms. Lockwood represented the Mayor at meetings, for example, or was authorized to speak on his behalf.  If Ms. Lockwood were merely a "gatekeeper" for Mayor Buckley— screening calls or emails, for instance—such functions might not necessarily equate with representing him.  This factor does not indisputably support a finding that Ms. Lockwood falls within the personal staff exception.

As to the fourth factor, whether the elected official exercises a considerable amount of control over the position, the City argues that "[Ms. Lockwood's] job duties include doing whatever the mayor tells her to do." [Filing No. 67 at 19.]  Ms. Lockwood stated in her deposition that her duties include "assist[ing] the mayor, [making] his appointments, [getting] the city council package ready, [getting] the board of works package ready, a lot of copying, a lot of scanning, [typing] ordinances that they give [her]." [Filing No. 85-1 at 9.]  She also stated, "I do whatever the mayor tells me to do." [Filing No. 85-1 at 9.]  From Ms. Lockwood's own statement, it appears that while she conducts a variety of tasks that do not require direct supervision by the Mayor, he exercises a considerable amount of control over the position.

As for factor five, the level of the position within the organization's chain of command, Mayor Buckley attested that Ms. Lockwood is the only member of his administrative support staff, and that they are the only people in the Mayor's office.  [Filing No. 63-1 at 2.]  As for the final factor, the actual intimacy of the working relationship between the elected official and the person filling the position, Mayor Buckley stated that "[a]s a result of her being [his] only administrative support person, [Ms.] Lockwood and [Mayor Buckley] work closely together and interact on a nearly daily basis." [Filing No. 63-1 at 2.]  In addition, Mayor Buckley stated that Ms. Lockwood

25

has access to his city email as well as confidential information within the Mayor's office.  [Filing No. 63-1 at 2.]

After reviewing the factors, the Court concludes that no genuine factual dispute exists as to whether Ms. Lockwood is a member of the "personal staff" of an elected official, as described by Title VII.  Five of the six factors weigh in favor of that finding.  The Court acknowledges that this determination is a very fact-specific inquiry that is not always well-suited to determination at the summary judgment stage.  *See Teneyuca*, 767 F.2d 148 at 152 (noting that "the highly factual nature of the inquiry necessary to the determination of the 'personal staff' exception does not lend itself well to disposition by summary judgment.").  However, here, Ms. Lockwood has not disputed any of the above-cited factual evidence put forward by the City and has not offered an alternative set of facts.  The Court also notes that other courts have concluded that personal secretaries and administrative assistants fall within the "personal staff" exemption at the summary judgment stage. *See, e.g., Saddler v. Quitman County School Dist.*, 278 Fed. Appx. 412, 418-19 (5th Cir. 2008) (per curiam); *Rutland v. Pepper*, 404 F.3d 921, 924 (5th Cir. 2005) (per curiam); *Bland v. New York,* 263 F.Supp.2d 526, 539 (E.D.N.Y. 2003).  Therefore, the Court concludes that there is no genuine dispute of material fact as to whether Ms. Lockwood qualifies as the personal staff of an elected official.  Accordingly, Ms. Lockwood is not an "employee" within the meaning of the statute, and the City is entitled to summary judgment on her Title VII claim.

### b. Ms. Mohr

The City argues that as the wastewater clerk in the clerk-treasurer's office, Ms. Mohr is a member of the personal staff of an elected official.  [Filing No. 67 at 22-23.]  The Plaintiffs do not develop their argument in response.  [Filing No. 86.]  As with Ms. Lockwood, the Court applies the *Teneyuca* factors to determine whether Ms. Mohr fits within the "personal staff" exception.

As to the first factor, Mr. McMillan has the plenary power of appointment and removal of Ms. Mohr's position. *See* I.C. § 36-5-6-7 ("The clerk-treasurer's deputies and employees serve at the clerk-treasurer's pleasure.")  Regarding the second factor, under Indiana law, the clerk-treasurer "has unfettered control and supervisory responsibility over employees." *Farmer v. Town of Speedway, Ind.*, 62 F. Supp. 3d 842, 852 (S.D. Ind. 2014).

As to the third factor, the City asserts that Ms. Mohr "represents the clerk-treasurer in her dealings with the public," but without reference to any admissible evidence.  While Ms. Mohr interacted with the public on sewage billing and payment issues, it is not evident from her position description that Ms. Mohr would be seen as representing the clerk-treasurer in the eyes of the public.  [Filing No. 63-10.]  Regarding the fourth factor, from Ms. Mohr's job description, it appears that the clerk-treasurer exercises a considerable amount of control over the position, in that many of Ms. Mohr's duties are subject to the approval of the clerk-treasurer or done as assigned by the clerk-treasurer.  [Filing No. 63-10.]  And regarding factors five and six, the City cites no evidence regarding the level of the position within the organization's chain of command, or the actual intimacy of the working relationship between Mr. McMillan and Ms. Mohr.

The City has put forward little evidence to support its assertion that Ms. Mohr is a member of the personal staff of an elected official.  The Court concludes that genuine issues of material fact remain as to whether Ms. Mohr may properly be considered a member of Mr. McMillan's personal staff, and therefore summary judgment is inappropriate on this issue.

### 2. Ms. Mohr and the Policymaking Appointee Exception

The City also contends that Ms. Mohr is an "appointee on the policymaking level," and as such, is excluded from the definition of "employee" under Title VII.  [Filing No. 67 at 22-24.]  Ms.

Mohr responds that she is neither an appointee nor at the policymaking level.  [Filing No. 86 at 28.]

Under Title VII, the term "employee…shall not include…an appointee on the policy making level."  42 U.S.C. § 2000e(f).  "An individual is considered an appointee on the policymaking level if the position held by the individual authorizes, either directly or indirectly, meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." *Opp v. Office of State's Attorney of Cook Cty.*, 630 F.3d 616, 619-20 (7th Cir. 2010) (internal quotations and citations omitted).  As the Seventh Circuit has held in the First Amendment context, applying the same test:

> …an individual's job title will not decide her fate as a policy-making employee; rather, the actual duties of the position must be examined and evaluated. Because the unique characteristics of a job will often influence this determination, an individual's status as a policy-making employee frequently poses a fact question. However, when the duties and responsibilities of a particular position are clearly defined by law and regulations, a court may resolve this issue without the aid of a finder of fact.

*Vargas-Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 972 (7th Cir. 2001) (citations omitted).

The City does not contend that Ms. Mohr's duties and responsibilities are clearly defined by either law or regulations.  Therefore, the Court must look to the actual duties of the position in order to determine whether Ms. Mohr was a policymaking official.  The City has not pointed to any job duty or responsibility that involves "meaningful input into governmental decision-making on issues where there is room for principled disagreement on goals or their implementation." *Opp*, 630 F.3d at 619-20.  Moreover, the Court has not identified any such responsibility in its review of Ms. Mohr's job description, [Filing No. 63-10], which Mr. McMillan testified was written by him, [Filing No. 85-6 at 11].  All of the duties listed in the job description appear to be clerical in

nature, involving primarily billing practices and financial records management. [Filing No. 85-6 at 11.] The only evidence referenced by the City (without citation) regarding Ms. Mohr's policy functions is that "one of her complaints about McMillan is that he refused to defer to her regarding office operations." The Court will not hunt through the record for that citation, and in any event, the City provides no analysis as to why "office operations" would necessarily entail policymaking decisions.

For the foregoing reasons, a genuine dispute of material fact exists as to whether Ms. Mohr is a policymaking appointee, and summary judgment on this issue is not warranted.

*3. Ms. Mohr's Employer*

The City contends that, for purposes of Title VII, the City of Beech Grove is not Ms. Mohr's employer—the independently elected clerk-treasurer is. [Filing No. 67 at 19-22.] As such, the City argues, it cannot be liable under Title VII for any harassment she may have suffered. [Filing No. 67 at 19-22.] Ms. Mohr responds that the City of Beech Grove is Ms. Mohr's employer, and that in any event, the City is responsible for enforcing federal antidiscrimination statutes. [Filing No. 86 at 26-27.]

"Employee status for purposes of Title VII and cognate laws protecting employees [is] determined by the principles of agency law rather than labels." *EEOC v. Severn Trent Servs., Inc.,* 358 F.3d 438, 445 (7th Cir. 2004). Agency principles require the Court to consider the following five factors, the first of which "is the most significant": "(1) the extent of the employer's control and supervision over the worker, (2) the kind of occupation and nature of skill required, (3) which party has responsibility for the costs of operation, such as the provision of equipment and supplies and the maintenance of the workplace, (4) the source of payment and benefits and (5) the duration of the job." *Hojnacki v. Klein–Acosta,* 285 F.3d 544, 550 (7th Cir. 2002).

Viewing the "most significant" factor first, Indiana law makes clear that the clerk-treasurer "has unfettered control and supervisory responsibility over employees." *Farmer v. Town of Speedway, Ind.*, 62 F. Supp. 3d 842, 852 (S.D. Ind. 2014); *see also* Ind. Code § 36–5–6–7(a) ("The clerk-treasurer's deputies and employees serve at the clerk-treasurer's pleasure."). The City of Beech Grove has absolutely no control or supervisory authority over clerk-treasurer employees such as Ms. Mohr. *See Farmer,* 62 F. Supp 3d at 852. Accordingly, this factor weighs strongly against finding that the City of Beech Grove was Ms. Mohr's employer. The parties do not address the second and third factors. As to the fourth factor, the source of payment and benefits, Ms. Mohr alleges that she was "hired and paid by the City of Beech Grove" and that "the City of Beech Grove was identified on her tax forms as her employer." [Filing No. 86 at 27.] However, Ms. Mohr does not cite to any admissible evidence in support of those assertions. Regarding the fifth factor, the duration of the job, Ms. Mohr served at the pleasure of the clerk-treasurer. [Filing No. 63-10 at 1.]

The first factor weighs heavily against finding an employer-employee relationship between the City of Beech Grove and Ms. Mohr, and none of the other factors weigh in her favor. The Seventh Circuit has stated that "[f]or an employer-employee relationship to exist ... the employer must have 'the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved....'" *Hojnacki,* 285 F.3d at 551. Given the weight placed on this factor by the Seventh Circuit, in conjunction with the fact that it heavily and unequivocally weighs against finding an employer-employee relationship between Ms. Mohr and the City of Beech Grove, the Court concludes that Ms. Mohr is not an employee of the City.

The Plaintiffs argue that this result unfairly permits the City to evade liability for harassment occurring on its watch.  [Filing No. 86 at 26-27.]  They cite *Wells v. Winnebago County, Illinois,* 820 F.3d 864 (7th Cir. 2016) as supporting the proposition that "[t]he City of Beech Grove cannot evade Title VII liability and claim it was not responsible for promoting a harassment-free workplace simply because Ms. Mohr worked in the Sewage Works Department." [Filing No. 86 at 27.]  In *Wells*, the Court considered whether an employee of the county could sue for discriminatory actions perpetrated by state employees.  *Wells,* 820 F.3d at 865.  In that case, however, the issue was not whether the plaintiff was an employee of the defendant—the question was rather how broad the employer's responsibility was to control the behavior of others in the workplace.  *Id.* at 866.  *Wells* is inapplicable to the facts of this case.

The City of Beech Grove is not Ms. Mohr's "employer" under Title VII and thus is entitled to summary judgment on that claim.

### 4. The Merits of the Plaintiffs' Title VII Claim

The Court has already concluded that summary judgment must be granted for the City on Ms. Lockwood's Title VII claim, because she is a member of the personal staff of an elected official.  The Court also concluded that summary judgment must be granted for the City on Ms. Mohr's claim, because the City is not her employer under Title VII.  For the sake of completeness, however, the Court addresses the parties' arguments on the merits of the Title VII claim.  For the reasons that follow, the Court concludes that even if Ms. Lockwood and Ms. Mohr were employees of the City of Beech Grove, the City would still be entitled to summary judgment.[6]

---

[6] The City also argues that some of the incidents alleged by the Plaintiffs are time-barred, and therefore should not be considered by the Court.  [Filing No. 67 at 26-27.]  Because the Court concludes that the Plaintiffs have not established a genuine dispute of material fact on the merits, even inclusive of the allegedly time-barred incidents, the Court need not reach this argument.

The City argues that the Plaintiffs cannot prove that they suffered actionable harassment based on their sex, and that the Plaintiffs cannot establish employer liability for any harassment. [Filing No. 67 at 27-31.]   The Plaintiffs respond that they have made the showing required to survive summary judgment.  [Filing No. 86 at 21-25.]

An actionable hostile work environment claim requires the plaintiff-employee to prove: "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Mendenhall v. Mueller Streamline Co.,* 419 F.3d 686, 691 (7th Cir. 2005).  Not all offensive workplace behavior violates the law. *Smith v. Sheahan,* 189 F.3d 529, 532-33 (7th Cir. 1999).  The conduct must be so severe or pervasive as to alter the terms or conditions of the employment relationship. *Id.*  The City contends that the Plaintiffs cannot satisfy the second and fourth elements of the required showing.[7]

### a. Harassment Based on Membership in Protected Class

As to the second element, the City argues that even accepting all of the alleged incidents of harassment as true, the Plaintiffs have presented no evidence to establish that any harassment was based on the Plaintiffs' sex.  The Plaintiffs point to only one allegation as establishing that the incidents they suffered were based on sex—that there was a "widespread pattern" of harassment against women, which creates the inference that the incidents the Plaintiffs suffered were based on their sex.

Not all incidents of workplace harassment constitute discrimination.  "Title VII protects against discrimination, not personal animosity or juvenile behavior." *Brown v. Advocate S.*

---

[7] Because the City does not raise any argument as to elements one and three—that the work environment was both subjectively and objectively offensive and that the conduct was severe or pervasive—the Court proceeds without making a determination as to those elements.

*Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012) (internal quotation and citation omitted). "Title VII is not a general civility code for the workplace…it does not prohibit harassment in general." *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000) (internal quotation and citation omitted). To be actionable as discrimination based on sex, "the unwelcome treatment need not be based on unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." *Passananti v. Cook Cty.*, 689 F.3d 655, 664 (7th Cir. 2012) (citations omitted). Instead, "words or conduct demonstrating anti-female animus can support a sexual harassment claim based on a hostile work environment." *Id.*

Ms. Mohr stated that she never witnessed Mr. McMillan make statements or take actions that she considered demeaning or harassing to a woman on the express basis of gender. [Filing No. 85-4 at 23.] In Ms. Lockwood's case, the incidents committed by Mr. McMillan include: rebuffing her offers to help train clerk-treasurer staff; informing Mayor Buckley that he did not want Ms. Lockwood on the clerk-treasurer side of the building; locking her out of the clerk-treasurer side of the building; glaring at her; bypassing or avoiding her when interacting with Mayor Buckley; referring to her as a "pain in the ass" to a third party; slamming a door behind her; not permitting her to order office supplies; not allowing her to post flyers regarding a farmer's market; having an ugly bouquet of flowers made for her; and allegedly inducing a third party to refer to Ms. Lockwood as "a piece of shit." As for Ms. Mohr, the incidents committed by Mr. McMillan include Mr. McMillan: yelling at her in front of the public and other employees; calling her a "bold-faced liar" after she accused Mr. McMillan of lying; and not looking at her when they

crossed paths in the hallway.  And finally, the Plaintiffs allege that two women resigned due to poor treatment by Mr. McMillan.[8]

The incidents described by the Plaintiffs do not, on their face, demonstrate any nexus to gender.  The events recounted by the Plaintiffs are similar to those at issue in *Brown v. Advocate South Suburban Hospital*, in which two nurses raised a claim of racial discrimination against their employer.  700 F.3d 1101, 1105 (7th Cir. 2012).  In that case, among other incidents, one plaintiff's supervisor called her "a trouble maker, a cry baby, and a spoiled child" during a meeting.  *Id.*  The court concluded that "all of the criticisms used non-racial language, and nothing else about their context suggests that they were racially motivated." *Id.* at 1106.  This is also the case here.  While Mr. McMillan's actions appear to demonstrate animus toward Ms. Lockwood and Ms. Mohr individually, they do not demonstrate animus toward women.  *See Brown,* 700 F.3d at 1105 ("Title VII protects against discrimination, not personal animosity or juvenile behavior.")  And none of the context surrounding the incidents suggests that they were motivated by gender animus.

The Plaintiffs contend that the fact that two women resigned from the clerk-treasurer's office provides evidence that Mr. McMillan's animus was actually directed at women in general, and therefore that his behavior toward Ms. Mohr and Ms. Lockwood was actually based on their sex.  The Plaintiffs point to *Smith v. Sheahan,* 189 F.3d 529 (7th Cir. 1999) as supporting their position that the Court should infer, based on the resignation of two women, that Mr. McMillan's behavior was motivated by gender animus.  However, the *Smith* case presented markedly different factual circumstances from those at issue here.

---

[8] The Plaintiffs allege that seven to nine female employees resigned from the clerk-treasurer's office due to Mr. McMillan's poor treatment of them, but they have submitted admissible evidence as to only two of those individuals.  Therefore the Court considers the Plaintiffs' allegations only as to those two women.

In *Smith*, a female Cook County, Illinois jail guard brought a discrimination suit against her employer based on the conduct of a coworker. *Id.* In that case, the coworker called the plaintiff a "bitch," threatened to "fuck [her] up," pinned her against a wall, and twisted her wrist so severely that she required surgery. *Smith*, 189 F.3d at 531. As further evidence of the plaintiff's contention that the coworker's actions were sex-based, rather than randomly violent, she submitted affidavits from six other guards tending to show that the coworker had a long history of offensive interactions with women, and that the Department knew about it. *Id.* One of the women submitting an affidavit stated, for example, that the coworker "made sexualized comments about her body as she passed through the scanning device he was operating at the entrance to the jail. When she objected, he became hostile and called her a 'bitch.'" *Id.* From this evidence, based on the totality of the circumstances, the court concluded that the plaintiff "presented sufficient evidence to raise the inference that [he] targets co-workers for his assaultive outbursts based on their sex." *Id.* at 533.

The Court cannot draw the same conclusion based on the facts of this case. The *Smith* court had before it six sworn affidavits from other victims. While Ms. Lockwood and Ms. Mohr have referenced other women who were allegedly victims of Mr. McMillan's offensive behavior, the Plaintiffs have provided no affidavits or deposition testimony from those victims to lend factual support to those allegations. In addition, the *Smith* court had before it evidence of "the explicitly gendered and sexually charged epithets [the coworker] hurls at his victims." *Id.* No such evidence has been put forward in this case.

In short, the behavior alleged here is the type of juvenile, even bullying conduct that, while perhaps offensive, is not prohibited or actionable under Title VII. The evidence before the Court does not permit an inference that Mr. McMillan's conduct was motivated by the Plaintiffs' gender.

### b. Employer Liability

The City also argues that even if the Plaintiffs could satisfy the first three prongs of Title VII liability, they cannot establish the fourth, that there is a basis for employer liability.  [Filing No. 67 at 32-35.]  The City argues that because Mr. McMillan was an elected official, there was little if anything that the City could have done to correct the offending behavior.  [Filing No. 67 at 32.]  The Plaintiffs respond that there were corrective measures that the City could have taken, and because the City did not exercise reasonable care to prevent or promptly correct sexually harassing behavior, it is liable for the harassment.  [Filing No. 86 at 23-25.]  They also argue that the City did not have or enforce a reasonable policy to protect employees from harassment.  [Filing No. 86 at 24.]

"An employer is liable for a hostile work environment claim if the plaintiff's supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was negligent either in discovering or remedying the harassment."  *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006) (citing *Mason v. S. Ill. Univ.,* 233 F.3d 1036, 1043 (7th Cir. 2000) (internal quotations omitted)).  In other words, "if the harasser is a supervisor, the employer is strictly liable for the harassment."  *Doe v. Oberweis Dairy*, 456 F.3d 704, 716 (7th Cir. 2006).  But if the harasser is a coworker, "the employer is liable only if it failed to have and enforce a reasonable policy for preventing harassment, or in short only if it was negligent in failing to protect the plaintiff from predatory coworkers."  *Id.*

Regarding Ms. Lockwood, Mr. McMillan is the individual who allegedly created the hostile work environment.  He is not Ms. Lockwood's supervisor, so the City is liable if "it failed to have and enforce a reasonable policy for preventing harassment," or if "it was negligent in failing to protect the plaintiff from predatory coworkers."  *Id*.

36

In 2013, Ms. Mohr reported Mr. McMillan's harassment to Mr. Bell.  [Filing No. 85-4 at 20.]  Mr. Bell said he would see what could be done.  [Filing No. 85-2 at 14.]  At least several months prior to that, Ms. Mohr had also reported the harassment to Mayor Buckley.  [Filing No. 85-4 at 20-21.] She testified that in 2013, there was no procedure in place for reporting harassment. [Filing No. 85-4 at 21.]  In April of 2014, the City (or Mr. Bell—the precise circumstances are not clear) initiated an investigation of Mr. McMillan's behavior.  [Filing No. 63-13 at 2.]  The Ogletree Report was delivered to Mayor Buckley, Mr. Bell, and City Attorney Craig Wiley on June 6, 2014. [Filing No. 85-18 at 1.]

On June 20, 2014, Ogletree Deakins released a "summary" version of the report.  At some point after the report was released, the City Council held an "executive session" at which it discussed the report.  [Filing No. 85-1 at 21; Filing No. 85-25 at 9.]  At some point after the executive session, the City Council passed General Ordinance No. 14, 2014, amending the City of Beech Grove Personnel Manual to include a section regarding sexual harassment in the workplace. [Filing No. 63-1 at 3; Filing No. 63-3.]  Mr. McMillan testified that he did not know when that ordinance became effective.  [Filing No. 85-6 at 24.]

The evidence submitted by the Plaintiffs supports the conclusion, and a rational jury could conclude that the City did not have or enforce a reasonable policy for preventing harassment.  The personnel manual submitted by the Plaintiffs does not include a section regarding workplace harassment, [Filing No. 85-9], and the Defendants have pointed to no other policy.  The fact that the City Council passed an ordinance adding such a policy to the personnel manual after receiving

the Ogletree Report further supports the conclusion that none was in place prior to receipt of the report.  Therefore, summary judgment on this basis in favor of the City is unwarranted.[9]

In summary, the City is entitled to summary judgment on Ms. Mohr's and Ms. Lockwood's Title VII claims, because Title VII protections do not extend to the Plaintiffs: the City is not Ms. Mohr's employer, and Ms. Lockwood is a member of the personal staff of an elected official. However, even if the Plaintiffs were covered by Title VII, the City would be entitled to summary judgment on the merits of the Plaintiffs' claims.  The Plaintiffs have not established that any harassment they suffered was based on their gender.

### B. Violations of the Equal Protection Clause and 42 U.S.C. § 1983

In their second count, the Plaintiffs allege that the City and Mr. McMillan violated the Plaintiffs' rights under the Equal Protection Clause of the United States Constitution by discriminating against them on the basis of gender when they created a hostile work environment. [Filing No. 35 at 5.]

*1. The City of Beech Grove*

The City argues that, as with its Title VII claim, the Plaintiffs have not established that they suffered actionable harassment based on gender.  [Filing No. 67 at 32-33.]  In addition, the City argues that even if the Plaintiffs could establish actionable harassment, they have not established that the violation occurred as a result of the City's policy or custom, as required under *Monell*. [Filing No. 67 at 33.]  The Plaintiffs respond that they have provided sufficient evidence of actionable harassment based on gender.  [Filing No. 86 at 30.]  They also argue that they have

---

[9] The Court concluded that the City is not Ms. Mohr's employer, and therefore cannot be liable for any harassment.  If the City were found to be Ms. Mohr's employer, however, the outcome would be the same as in Ms. Lockwood's case: Mr. McMillan is Ms. Mohr's supervisor, so the City would be strictly liable for any harassment, and summary judgment on this element would be unwarranted.

produced sufficient evidence to establish a genuine dispute of material fact regarding *Monell* liability.  [Filing No. 86 at 32.]

Gender discrimination claims arising under the Equal Protection Clause and Section 1983 are generally evaluated under substantially the same framework as Title VII claims.  *See Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 835 (7th Cir. 2015) ("When a plaintiff uses § 1983 as a parallel remedy to a Title VII harassment claim, the *prima facie* elements to establish liability are the same under both statutes.").  However, the standard for proving discrimination in a Section 1983 claim differs slightly from that of a Title VII claim:

> We have stated … that because the Constitution prohibits *intentional* discrimination by state actors, § 1983 relief is available to a plaintiff claiming a hostile work environment only when she can demonstrate that the defendant acted with discriminatory intent.  The same is not true of a Title VII plaintiff claiming hostile work environment harassment. *See King v. Bd. of Regents of Univ. of Wisconsin Sys.,* 898 F.2d 533, 537-38 (7th Cir. 1990) ("One difference between sexual harassment under equal protection and under Title VII, however, is that the defendant must intend to harass under equal protection ... but not under Title VII, where the inquiry is solely from the plaintiff's perspective."); *Bohen v. City of East Chicago, Indiana,* 799 F.2d 1180, 1187 (7th Cir. 1986) ("[T]he ultimate inquiry [in a § 1983 hostile work environment equal protection claim] is whether the sexual harassment constitutes intentional discrimination. This focus differs from the inquiry under Title VII as to whether the sexual harassment altered the conditions of the victim's employment.").

*Huff v. Sheahan*, 493 F.3d 893, 902 (7th Cir. 2007) (some internal citations omitted).

A plaintiff can make a showing of sex discrimination "either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination." *Bohen*, 799 F.2d at 1187.  Actions of a state entity's employees are attributed to the state entity "if those actions are in furtherance of the entity's "policy or custom." *Id.* at 1188-89 (citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978)).  A single act of a sufficiently

high-ranking policy-maker is sufficient to establish an entity's policy or custom. *Bohen,* 799 F.2d at 1189. "A policy or custom may also be established by proving that the conduct complained of is a well-settled ... practice ... even though such a custom has not received formal approval through the body's decision making channels." *Id.*

For the reasons described previously in Subpart III.A, the Court concludes that the Plaintiffs have not provided sufficient evidence for a rational jury to conclude that they suffered actionable harassment based on gender. Because the Plaintiffs cannot establish a constitutional deprivation, the City is entitled to summary judgment on the Plaintiffs' Equal Protection Claim.[10]

*2. Mr. McMillan*

Mr. McMillan argues that he is entitled to summary judgment on the Plaintiffs' Equal Protection claims because (1) they have not suffered actionable harassment; (2) Mr. McMillan is entitled to qualified immunity; (3) the Plaintiffs have not established liability under *Monell*; and (4) the Plaintiffs' claims are barred by the applicable statute of limitations.

For the reasons previously described, the Plaintiffs cannot establish that a constitutional deprivation occurred, because they have not provided sufficient evidence for a rational jury to conclude that they suffered harassment based on their gender. For this reason, Mr. McMillan is entitled to summary judgment.

Because the Court concludes that the Plaintiffs have not established that a constitutional violation occurred, it need not reach the issue of qualified immunity. *See Mucha v. Village of Oak Brook,* 650 F.3d 1053, 1057-58 (7th Cir. 2011) (when there is no constitutional violation,

---

[10] The Court need not reach the *Monell* liability issue, since liability depends on an underlying violation. *See Sallenger v. City of Springfield, Ill.,* 630 F.3d 499, 504-05 (7th Cir. 2010) (concluding that "because there is no underlying constitutional violation, the City cannot be held liable under *Monell*").

defendants "do not require the additional protection of qualified immunity."). Likewise, the Court need not address the question of *Monell* liability, as such liability depends on the existence of an underlying violation. And finally, like the City, Mr. McMillan argues that some of the incidents alleged by the Plaintiffs are time-barred, and therefore should not be considered by the Court. [Filing No. 72 at 13-14.] Because the Court concludes that Mr. McMillan is entitled to summary judgment even when the allegedly time-barred incidents are considered, the Court need not reach the statute of limitations issue.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **OVERRULES IN PART** and **SUSTAINS IN PART** Mr. McMillan's objections to the admission of certain evidence: [Filing No. 96.]

- Mr. McMillan's objection to the admission of the resignation letters of Brenda Michael, [Filing No. 85-15], and Janet Moore, [Filing No. 85-16], is **OVERRULED**;

- Mr. McMillan's objection to the admission of the Ogletree Report is **SUSTAINED**; and

- Mr. McMillan's objections to the admission of certain statements in the Plaintiff's brief are **OVERRULED IN PART AND SUSTAINED IN PART**.

The Court **GRANTS** the Defendants' Motions for Summary Judgment. [Filing No. 63; Filing No. 68.] Final judgment shall enter accordingly.

Date: 2/24/2017

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

41